# 𝔖taunton

## Irving Freezer v. J. T. Miller.

September 20, 1934.

Present, Campbell, C. J., and Holt, Epes, Hudgins, Browning and Chinn, JJ.

The opinion states the case.

*R. I. Roop* and *John B. Spiers,* for the plaintiff in error.

*Howard C. Gilmer, Ted Dalton,* and *Showalter, Parsons, Kuyk & Coleman,* for the defendant in error.

EPES, J., delivered the opinion of the court.

The proceeding in which the judgment here under review was entered was originally a petition for an attachment, filed on May 31, 1930, by J. T. Miller against J. Freezer and

Irving Freezer, partners doing business under the name of J. Freezer & Son.

The ground of attachment was that the defendants were nonresidents of the State of Virginia. The cause of action which the plaintiff asserts against the defendants is a claim for damages for malicious prosecution. He alleges that the defendants, through their agent, Herbert Freezer, maliciously and without probable cause, made complaint under oath to the civil and police justice of the city of Radford charging that J. T. Miller "is storing and concealing in his premises and residence * * * stolen goods;" that upon such complaint they, through their agent, Herbert Freezer, had a search warrant issued for the search of the plaintiff's premises for stolen goods; and that upon a search being made under such warrant no stolen goods were found upon the plaintiff's premises or in his possession.

As a petition for an attachment the petition is defective. But the proceedings which were had upon it were had as upon a notice of motion for judgment; and as the only judgment entered was a personal judgment against Irving Freezer, we shall treat the matter as being upon a notice of motion for judgment against Irving Freezer. (See section 6404 and section 6264, Code Va. 1919.)

J. Freezer made no appearance. Irving Freezer filed a demurrer and answer to the petition. It is not necessary to consider the grounds of demurrer further than to say that none of them is well taken. In his answer he in effect pleads the general issue, "not guilty," specifically denies that Herbert Freezer was acting as his agent in swearing out the search warrant and causing the search to be made of the plaintiff's premises, and alleges that he knew nothing about it, was not in any way responsible for it, and has not ratified any of Herbert Freezer's acts in connection therewith.

There were two trials of the case. Upon the first trial the jury returned a verdict for the defendant. The plaintiff moved the court to set the verdict aside on the ground that it was contrary to *the law and the evidence.* The court

sustained this motion and entered an order granting the plaintiff a new trial. When the case was again called for trial at a subsequent term, the court, over the objection of the defendant, limited the trial to the question of the quantum of damages, and had the jury sworn to "well and truly try this case and assess the damages the plaintiff hath sustained by reason of the wrongful search of the premises by the defendants." Upon the second trial the jury returned a verdict for $1,300. The court overruled the motion of the defendant to set aside this verdict, and entered judgment for the plaintiff in accordance therewith.

The plaintiff in error makes eight assignments of error which relate to the first trial. The first assignment is that the court erred in refusing to sustain the demurrer to the notice of motion for judgment. This we have already disposed of. The second assignment is that the court erred in refusing to strike out the plaintiff's evidence. It is not necessary to notice this assignment further than to say that it is not well made. The third assignment of error is that the court erred in setting aside the verdict returned by the jury on the first trial. Assignments of error four to eight, inclusive, relate to the giving and refusing of instructions. As the jury returned a verdict for the defendant below, he could not have been prejudiced by any error which may have been committed in the giving or refusing of instructions; and we shall not notice these assignments of error except in so far as we shall pass upon some of the questions raised thereby in passing upon whether the court erred in setting aside the verdict.

There is little material conflict in the evidence which was introduced upon the first trial. Resolving such conflicts as there are in favor of the defendant, the testimony, so far as it is material, is as follows:

J. Freezer and his son, Irving Freezer, as partners doing business under the name and style of J. Freezer & Son, are the owners and operators of a shirt factory located in the city of Radford, Virginia. The partnership also owns and operates two plants located outside of Virginia. The

"head offices" of the partnership are in New York City,
New York, where both J. Freezer and Irving Freezer live
and spend most of their time in the executive management
of their business.

Herbert Freezer, who is a son of J. Freezer, but not a
member of the partnership, is employed by the partnership
and has general charge of the conduct of the operations of
its Radford plant. The scope of his employment is thus
described by Irving Freezer. "He had general charge of the
factory all the time." * * * "'He had general charge of the
operations and protection of" our goods. * * * "We had
him down here and he was instructed to do the best he
could to safeguard our interests and our property." * * *
"I told him to watch the operation of the factory and to keep
his eyes open and to see that all the stuff was being made
in the factory, and I furthermore told him to give Mr. Miller
[the defendant in error] instructions to be sure that at night
all the doors were barred, and to be sure everything re-
mained in the factory at night."

The following facts bearing upon the scope of Herbert
Freezer's employment also appear from the evidence: Pur-
chases for the Radford plant and sales of its products were
not made by him, but by the New York office. All foremen
for the Radford plant (of which there were a number) were
hired and discharged by the New York office. While it is
not so stated, the fair inference from the evidence is that
Herbert Freezer had the power to hire and discharge ordi-
nary employees. The weekly pay roll was made up in Rad-
ford, the New York office advised of the amount, a draft
drawn on the partnership in New York for that amount,
and the employees paid in Radford. Though it is not ex-
pressly so stated, the fair inference from the evidence is
that this was done by or under the supervision of Herbert
Freezer. Other than this handling of the weekly pay roll
he had no authority to pay any bills other than for incidental
items payable from a petty cash account.

Herbert Freezer had never been given any express au-
thority by the partners, or either of them to have search

warrants or any other warrants issued; and it was not known by them, or either of them, until some two weeks after the search warrant mentioned in the pleadings was issued, that he had ever had a warrant issued against any person.

Irving Freezer comes to Radford from time to time, as he says, "to look over the plant, look over the work and see what was going on, check up on the bookkeeper and the factory and the shirts and the general routine, just to see that everything was running along in good order." Irving Freezer made a visit to the Radford plant on September 16 and again on October 22, 1929, but neither he nor J. Freezer were in Radford between those dates.

J. T. Miller was employed as a night watchman at the Radford shirt factory. He is a man of family, was sixty-six years old at the time here in question, bore and bears a good reputation both in Radford and other places in which he has lived, and at this time had been in the employment of this partnership as night watchman "for many months."

For some time just prior to October 8, 1929, shirts had been missed on a number of occasions from the factory in which Miller served as night watchman, none of which had ever been recovered, though Herbert Freezer had had some eight or ten search warrants issued to have searchs made for them.

On the morning of October 8th, Herbert Freezer received a post card postmarked "East Radford" and addressed to him, which read as follows:

"Packages Going Out of Factory At Night Search Watchman House and Garage.

"Friend."

Herbert Freezer did not know who was responsible for mailing him the card, and none of the parties involved has ever been able to find out.

After the search of Miller's house had been made Herbert Freezer received a letter stating that one of the other watch-

men was stealing; but it does not appear that any night watchman other than Miller was employed at the factory.[1]

In about an hour after he received the card, he went to see Mr. Leo Howard, the civil and police justice for the city of Radford, who is also an attorney at law. He found him in a pool room, called him aside and told him about having received the post card and showed it to him. He consulted Mr. Howard in his official capacity and not as his attorney. The police justice was not called as a witness. Herbert Freezer was introduced as a witness by the defendant. The whole of his testimony as to what took place between himself and the civil and police justice at this time and later is as follows:

"Q. When you found him in the pool room, did you consult with him about the question of search warrant?

"A. I called him aside and told him about my having received a postal card and showed it to him and asked his advice as to what procedure to take.

"Q. What did he tell you at that time?

"A. He told me that if we had been missing shirts, and did not have a right to search a man's house after receiving a postal card like that, he did not know anything in the world that would ever give us a right to make a search.

"Q. Did you get the search warrant then?

"A. No, I did not.

"Q. Did Mr. Howard give you any instructions about when to see him?

"A. Mr. Howard asked me to see him at his office that afternoon.

"Q. You did not see him on that afternoon, I believe?

"A. I looked for him and he was out of town.

"Q. When did you next hear from him or see him, Mr. Freezer?

"A. I did not see him. That evening I went to Roanoke and came back at 12 o'clock, and I had gotten two officers

---

[1] In the evidence introduced at the second trial it affirmatively appears that Miller was the only night watchman employed at the shirt factory.

who were in the restaurant and talked to *him* and told them about my having taken the matter up with Leo Howard, I got hold of the two police officers [J. F. Helvey and L. C. Schaub] and told them about my having taken the matter up with Leo Howard that morning, and he having authorized the search, and asked them whether or not they wanted to make the search, and they said they could not very well search a man's house unless they had a warrant, and I asked them whether they would take it up with Leo Howard.

"Q. After that time was a search made by Mr. Schaub and Mr. Helvey?

"A. Yes."

Helvey was introduced as a witness by the plaintiff. His testimony as to what took place when the search warrant was issued and when the search was made is as follows:

"Herbert Freezer came to me between ten and eleven o'clock on the night of October 8, 1929, and talked to me about the issuance of this search warrant. He told me 'he had showed him [Mr. Leo Howard, the civil and police justice] this card * * * that day at the pool room, * * * and asked him about a warrant, or what he thought about a warrant, for the search of the premises [of Miller], so he told me that Leo told him that was not ground enough for the search warrant.' A little later Mr. Freezer had me call the civil and police justice over the telephone and ask him to issue the warrant. I told the justice about the card Mr. Freezer had gotten, and he said 'Yes' he knew about it, that Mr. Freezer had mentioned it to him. I asked him to issue the warrant, but he told me the card was not sufficient evidence upon which to issue the warrant. I then asked him if he wanted to talk to Mr. Freezer and he said 'Yes,' and I turned the telephone over to Mr. Freezer without telling him what the justice had said to me. I don't know what the justice said to him. However, the trend of the conversation was about the same that I had had with the justice, and the justice 'told him that he would not give him the warrant on that.' Mr. Freezer insisted that he wanted the warrant,

and after some further conversation with the justice (which the witness does not relate), Mr. Freezer turned to me and said: 'Leo said he would give me the warrant,' and told me to go to his apartment and get it. I went to his apartment, got the warrant, and came back. Mr. Herbert Freezer and a police officer named Schaub joined me, and the three of us went together to the home of Miller. On the way to Miller's home 'we talked about this case and I told him—we told him we had never heard anything against Miller in our lives, did not know he was that kind of a man; and Mr. Freezer said he could not believe he was, himself, took him to be an honest, straightforward man.'

"Schaub, Mr. Freezer and myself went to Miller's home and searched his house and garage about midnight, October 8th, but found nothing. Miller was not at home when the search was made, but two of his grandsons let us in the house and showed us around. After we had made the search, which was made in a quiet, orderly way, Herbert Freezer said it was 'just as he had expected; that he wanted to be satisfied in his own mind; that he had other trouble before along that same line, and had made several cases on the same ground, and he was just trying to straighten out some of the affairs going on at the factory.' 'He said he wanted to be satisfied as to whether there was anything to it or not.' * * * 'He spoke well of Mr. Miller; he believed Mr. Miller to be [an] honest straightforward man, was the words he used.' Before we made the search he had told us he did not expect to find anything there."

Schaub, who was introduced as a witness by the plaintiff, adds nothing material to the testimony of Helvey, except that he says that Herbert Freezer "seemed to be pleased" that they found nothing when they made the search.

Though Herbert Freezer was not put on the witness stand until after Helvey had testified, he did not contradict any of the above-mentioned statements made by Helvey. As has been noted, he said that the police justice told him at the pool room "that if we had been missing shirts and did not have a right to search a man's house after receiving a

postal card like that, he did not know anything in the world that would give us a right to make a search." But he does not deny that he told Helvey that the police justice had told him at the pool room that "that was not ground enough for the search warrant."

On the afternoon of October 8th, Herbert Freezer stayed at the factory until after all the other employees had left, and had a conversation with Miller. In this conversation he told Miller that he had received a letter stating that he had carried some shirts away from the factory. Miller replied, "Mr. Freezer, there is nothing like that, * * * if that is the kind of man you are accusing me of—things like that I will just walk out." Herbert Freezer's reply was that "he did not believe it." This was before the search warrant was issued.

When the officers and Freezer went to search Miller's house they went by mistake to the next house in which Miss Crush lives. The first that Miller knew about his house having been searched was when he returned from the factory on the morning of October 9th, when Miss Crush told him about it. That afternoon about five o'clock Miller returned to work, and Herbert Freezer had a conversation with him, about which Freezer testified as follows:

"Q. Did you speak to him about this search?

"A. Yes, sir, I went out and told him and said Mr. Miller, a very unfortunate thing happened; we received a postal card, and I showed it to him and read it to him, and says we searched your house last night and did not find any shirts.

"Q. You were talking about what you and the officers had done, you had gone along?

"A. Yes, sir, the officers and myself went up there and searched the house; I told him, and told him we had not found anything, and I said under the circumstances you cannot blame me for getting a search warrant and going up and searching, he told me that he could not imagine who

sent it, and then after thinking a few moments accused a woman by the name of ——————."

Notwithstanding this occurrence, Miller continued to work as night watchman at the factory until during the first week in February, 1930.

The first that either J. Freezer or Irving Freezer heard about this matter was when Irving Freezer made a visit to the Radford plant on October 22, 1929. At that time Herbert Freezer told him about it. He at once censured Herbert Freezer for having had the warrant issued and saw Miller and told him that he regretted the occurrence very much; that he did not approve of it, and that Mr. J. Freezer would never have approved it. The first time that J. Freezer came to Radford after this occurrence he saw Miller and told him that he was sorry it had happened, and that he did not believe that he had taken any shirts belonging to them.

Miller's testimony bearing upon why he continued to work for the partnership from October 9, 1929, to February, 1930, is this: On the day following the search Herbert Freezer asked him to come on back to work, and the police justice "advised me to go back and he would trace this thing up and straighten it up." "They promised to look this thing up and straighten it up about * * * searching my house—getting the post card and finally locate the fellow who wrote the post card; but they never said anything or did anything about it." "They said they notified the postmaster and post office to find out who put the card in the office," [but] "I don't think they tried to find out." * * * "I asked him [the postmaster] myself after it went on a long time; he said he did not know anything about it." * * * "Told me they had never said anything to him about it." * * * "Said they never asked him to find out anything about it."

In reply to the question, "You continued on working down there, and your relations were perfectly pleasant after that, weren't they?" Miller replied, "Yes, yes."

When he left their employment in February, 1930, Miller went to the office and left a letter there advising them that

he was quitting work, in which he gave his reason for doing so that he was sick from staying down there in the cold. He said nothing about his house having been searched, nor did he make any complaint of the treatment he had received at the hands of either of the partners or of Herbert Freezer.

Miller testified to no inquiry which his reputation had suffered by reason of the issuance of this search warrant and the search of his premises, nor does he testify to any special damage he had suffered therefrom. He introduced seven witnesses, in addition to the two police officers, all of whom testified that before this occurrence he bore a good reputation, and that he still has a good reputation and, notwithstanding this occurrence, stands as well as he ever did.

The court gave the jury seven instructions. Instructions 1, 2, 3, 4 and 5 were given at the request of the plaintiff. To each of them the defendant objected. A number of instructions asked for by the defendant were refused, but instructions A and B were given at the request of the defendant. These instructions reflect so well the view which the court entertained of the law applicable to this case that they are quoted at length:

Instruction No. 1. "If you shall believe from the evidence that Herbert Freezer was an agent of the partnership of J. Freezer and Son invested with the duty of conducting the routine business of the partnership at Radford, Virginia, and of taking care of and protecting its property at its plant in the city of Radford, Virginia, then Herbert Freezer, by virtue of the scope of his duties and authority, was acting as the agent of the partnership, and of each member of it, in suing out the search warrant in this case, and was therefore acting as the agent of said Irving Freezer, one of the parties, and the said Irving Freezer is responsible for his conduct in respect to this search warrant."

Instruction No. 2. "You are instructed that if Irving Freezer in his defense in this case relies on the contention that he, through Herbert Freezer as his agent, sought and

obtained the advice of Leo Howard, police justice, before suing out the warrant, the burden is on him to prove that he made a full, correct and honest disclosure to said police justice of all the material facts, and of his own belief, bearing upon the guilt of J. T. Miller, the plaintiff, and also of all such facts as reasonable diligence in making inquiries would have disclosed to said Freezer; and unless you shall believe from the evidence that said Freezer did this, such a defense will not avail him."

Instruction No. 3. "You are instructed that to constitute malice it is not necessary that the legally malicious act should be prompted by anger or vindictiveness, or spite. And if, in this case, you shall believe from the evidence that the search warrant was sued out without such a cause as would have prompted a reasonable man, acting in good faith and with due regard to the rights of J. T. Miller, to sue it out and have it executed by police officers, then malice is inferred from these acts themselves.

"In other words, if you shall find from the evidence that this warrant was sued out and its execution procured without such a cause as is above described, the malice necessary to make the defendant liable to the plaintiff flows as a matter of law from the act itself."

Instruction No. 4. "You are further instructed in this case, as a matter of law that probable cause did not exist for the swearing out of the search warrant by Herbert Freezer, by virtue of which the premises of the plaintiff were searched, therefore if you believe from the preponderance of the evidence that the said search warrant was sworn out maliciously—and malice may be inferred by you because a lack of probable cause existed—then you shall find for the plaintiff in such sums as in your opinion will compensate him for the damages suffered not to exceed, however, $10,000, provided you further believe that at the time the search warrant was sworn out Herbert Freezer was acting as the agent of the defendant and in the scope of his employment. The rule by which you will be guided in arriv-

ing at the amount of damages will be set out in a separate instruction."

Instruction No. 5. "If you shall believe from the evidence that the defendant is liable you shall find such an amount of damages in favor of the plaintiff, within the limit set by the attachment petition, as in your judgment will be fair and just compensation for his mortification, mental suffering, and the injury to his reputation taking into consideration all of the evidence."

Instruction A. "The court instructs the jury that the burden is on the plaintiff to establish affirmatively the following facts by a preponderance of the evidence before he is entitled to any verdict in this case:

"(1) That there was a search warrant issued against J. T. Miller.

"(2) That the proceedings under the alleged search warrant terminated favorably to said J. T. Miller.

"(3) That a search warrant was sued out and a search made under the said search warrant and that the said J. T. Miller has suffered damages as a proximate result thereof; and unless the plaintiff establishes each and every element as above set forth the jury must find for the defendant, Irving Freezer."

Instruction B. "The court instructs the jury that it is their duty to try this case without being influenced by sympathy, and should disregard the relative conditions of the plaintiff and defendant, as the jury as much as the court are under solemn obligation of an oath to decide according to the law and the facts, in this as well as in all cases."

The jury returned a verdict for the defendant. The plaintiff moved the court to set aside the verdict of the jury "as contrary to the law and the evidence." On December 23, 1932, it set aside the verdict by an order reading as follows:

"The court having maturely considered the motion of plaintiff to set aside the verdict of the jury as contrary to the law and the evidence, doth for reasons reduced to writing and filed in the case sustain said motion, and doth grant

unto the plaintiff a new trial; to which ruling of the court the defendant by counsel excepts. But the plaintiff is required to pay the costs of the former trial of this case on or before the first day of the next term of this court, as prescribed by law."

Though in its order the court says that it set the verdict aside for reasons reduced to writing and filed in the case, this writing is not included in the record certified up to us.

When the case was again called for trial on April 27, 1933, the court directed the clerk to swear the jury to "well and truly try this case and assess the damages the plaintiff hath sustained by reason of the wrongful search of his premises by the defendants."

The defendant, Irving Freezer, objected to the limitation of the issue to the assessment of damages; but the court overruled the motion and limited the issue before the jury to the quantum of damages and refused to permit the introduction of evidence bearing upon the question of the right of the plaintiff to recover.[2] The case was then submitted to the jury on the evidence introduced and the instructions of the court, and the jury returned a verdict finding for the plaintiff, J. F. Miller, against the defendant, Irving Freezer, and fixing his damages at $1,300.

The defendant moved the court to set aside the verdict of the jury and enter up final judgment for him stating his grounds therefor, which need not be here recited, but the

---

[2] The plaintiff in error makes the point that, having entered an order at one term setting the verdict aside and granting a new trial generally, the court was without power to change, or in effect change, this order at a subsequent term, and limit the new trial to the question of damages. This point is not well made. The order setting aside the verdict was an interlocutory order; and if the court should have set aside the verdict on the ground that the evidence was wholly insufficient to sustain a verdict for the defendant and sufficient, as a matter of law to establish the plaintiff's right to recover, it had the power at a subsequent term to so modify its former order, impanel a jury to assess the damages, and enter final judgment for the damages so assessed.

"An interlocutory judgment or decree made in the progress of a cause, is always under the control of the court until the final decision of the suit, and it may be modified or rescinded, upon sufficient grounds shown, at any time before final judgment, though it be after the term in which the interlocutory decision was given." Black on

court overruled the motion and entered the following judgment: "It is, therefore, considered by the court that J. T. Miller recover of Irving Freezer the sum of $1,300 with interest thereon from this date and the costs of this suit."

The position taken by the plaintiff in error in support of his contention that the court erred in setting aside the verdict rendered on the first trial is in effect this. As the court gave all the instructions asked for by plaintiff below and there was no objection to the instructions given at the request of the defendant, the court erred in setting aside the verdict for three reasons, any one of which is sufficient, if it is good, to require that the judgment of the court be reversed and judgment entered for the defendant upon the verdict:

(a) The evidence is sufficient to sustain a verdict for the defendant predicated upon a finding that Herbert Freezer was not acting within the scope of his employment in suing out this search warrant, and that his action in so doing was neither authorized nor thereafter ratified by the partners or either of them. The court erred in instructing the jury as it did in instruction No. 1.

(b) The evidence is sufficient to sustain a verdict for the defendant predicated upon a finding that Herbert Freezer had probable cause for swearing out the warrant. The court erred in instructing the jury in instruction No. 4 that the evidence established as a matter of law that probable cause did not exist for swearing out the search warrant.

---

Jdgts. (2d Ed.) vol. 1, section 308, and vol. 2, section 509; 1 Freeman on Jdgts. (5th Ed.) p. 200, section 191, and p. 279, section 143. The following cases, all actions at law, support this view, and in our search we have found no case either at law or in chancery holding the contrary: *Clarke* v. *Ohio River R. Co.*, 39 W. Va. 732, 20 S. E. 696; *Rheims* v. *Standard Fire Ins. Co.*, 39 W. Va. 672, 689, 20 S. E. 670; *Lothrop* v. *Page*, 26 Me. 119; *Woodcock* v. *Parker*, 35 Me. 138; *Cross* v. *Clement*, 70 Me. 502; *Myers* v. *Thompson*, 117 Me. 80, 102 Atl. 776; *In the Matter of Marquis*, 85 Mo. 615; *Henry Sawtell, Petitioner*, 6 Pick. (Mass.) 110.

In Lile's Eq. Pl. & Pr. (2d Ed.) section 197, the author intimates that the rule with reference to modifying interlocutory orders at a subsequent term is different at common law from what it is in chancery; but he cites no authority so holding, and we have been able to find none.

(c) The evidence is sufficient to sustain a verdict for the defendant predicated upon a finding that Herbert Freezer sued out the search warrant without any malice. Even assuming that the evidence is sufficient to establish as a matter of law that Herbert Freezer did not have probable cause for swearing out the warrant, the court erred in instructing the jury in instruction No. 3 that if they believed from the evidence the warrant "was sued out without such a cause as would have prompted a reasonable man acting in good faith and with due regard to the rights of J. T. Miller to sue it out, * * * the malice necessary to make the defendant liable to the plaintiff flows as a matter of law from the act itself."

The first ground upon which the plaintiff in error contends that the court erred in setting the verdict aside is not well made.

■■ "Undoubtedly a principal may be held liable for the act of his agent in instituting a malicious prosecution. But the act of the agent becomes that of the principal only when expressly authorized, or when his authority to act may fairly be inferred from the nature and scope of the employment. Generally, the duty of superintendence does not carry with it the duty to arrest or prosecute. The inference of authority to do either does not arise from the mere fact of the agency. * * * The trend of decision is against holding the principal liable when the arrest has been made after the supposed crime had been committed, and not for the protection of his property or interests. In such cases the agent has been presumed to have acted on his own account, for the vindication of justice."[3]

■ In the instant case there is no conflict in the evidence with reference to the scope of Herbert Freezer's employment; and the fair inference from the evidence is that it was so broad as to practically constitute him the *alter ego* at the Radford plant of the partners in all matters pertaining to the protection of the partnership property, and to give him,

[3] *Markley* v. *Snow*, 207 Pa. St. 447, 451, 56 Atl. 999, 1000, 64 L. R. A. 685; 1 Cooley on Torts (3d Ed.) p. 343; 18 R. C. L. pp. 65-66, section 47.

in the absence of instructions to the contrary, implied authority to institute prosecutions ·for the protection of the partnership interests and property. Even assuming that the controlling motive of Herbert Freezer in suing out the search warrant was the vindication of justice and the punishment of the supposed offender, there was incidental thereto sufficient purpose of ·the protection of the partnership interests and property to bring it within the implied scope of his very broad employment. We are of opinion that the evidence in this case establishes as a matter of law that the swearing out of·this search warrant was within the implied scope of Herbert Freezer's employment. See, in this connection, *Clinchfield Coal Corp.* v. *Redd,* 123 Va. 420, 431-435, 96 S. E. 836; *Evans* v. *Michaelson,* 146 Va. 64, 135 S. E. 683. However, we feel that we should say in passing that we do not approve instruction No. 1 for general use.

The second and third grounds upon which the plaintiff in error contends the court erred in setting aside the verdict can best be considered somewhat together.

▊ To sustain an action for a malicious criminal prosecution it must be alleged and proved both that the prosecution was instituted without probable cause therefor, *and* that it was instituted with actual malice, *i. e.,* was instituted with a malicious motive. *Scott* v. *Shelor,* 28 Gratt. (69 Va.) 891, 899; 1 Cooley on Torts (3d Ed.) p. 320; 38 C. J. p. 363, section 1; Burks' Pl. & Pr. (2d Ed.) p. 195.

"There must be a concurrence of malice and want of probable cause. Neither, however, clearly established, will support an action, in the absence of the other." 26 Am. St. Rep., note at p. 149; *Scott* v. *Shelor,* 28 Gratt. (69 Va.) 891, 909; *Womack* v. *Circle,* 32 Gratt. (73 Va.) 324, 332 and 344; *Gresham* v. *Am. Ry. Exp. Co.,* 147 Va. 395, 399, 137 S. E. 471. It must be borne in mind, however, that the terms *probable cause* and *malice* as used in relation to an action for a malicious criminal prosecution have the technical meanings hereafter given.

"While as the name implies, malice is the root of the action of malicious prosecution, malice alone even when ex-

treme is not enough, but want of probable cause for the institution of the original proceeding must also be shown. If probable cause exists, it is an absolute protection against an action for malicious prosecution, even when malice is proved." 18 R. C. L. p. 33, section 19; *Virginia-Tenn. Motor Truck Corp.* v. *Wilson,* 140 Va. 260, 276, 124 S. E. 231.

Though the cause or grounds upon which a criminal prosecution was instituted may have been insufficient to constitute probable cause therefor, if it be shown that the prosecution was not in fact instituted from a wrongful motive an action for malicious prosecution will not lie. 18 R. C. L. p. 31, section 17; *Womack* v. *Circle,* 32 Gratt. (73 Va.) 324, 332; *Atkinson* v. *Birmingham,* 44 R. I. 123, 116 Atl. 205, 36 A. L. R. 366; *Griswold* v. *Horne,* 19 Ariz. 56, 165 Pac. 318, L. R. A. 1918A, 862 and note; *Bell* v. *Graham,* 1 Nott & McC. (S. C.) 278, 9 Am. Dec. 687; *Madison* v. *Penn. R. R. Co.,* 147 Pa. St. 509, 23 Atl. 764, 30 Am. St. Rep. 756; *Lunsford* v. *Dietrich,* 86 Ala. 250, 5 So. 461, 11 Am. St. Rep. 37; *Threefoot* v. *Nuckols,* 68 Miss. 116, 8 So. 335.

In *Womack* v. *Circle,* 32 Gratt. (73 Va.) 324, at p. 332, the court says: "In *Herman* v. *Brookerhoff,* 8 Watts. (Pa.) 240, Chief Justice Gibson said, 'In a criminal prosecution want of probable cause must be combined with malice.' Again he says, 'want of probable cause is evidence of malice, though inconclusive in the origination of a prosecution.' Cases may be readily conceived, where the prosecution was instituted upon grounds of suspicion which would not amount to probable cause, where there was an entire absence of ill will or malice, on the part of the prosecutor. In such cases the action would not lie, because there must be combined malice and want of probable cause shown. And although malice may be implied from the want of probable cause, if the circumstances will warrant the implication, yet the existence of malice may be repelled by the circumstances though there was not good ground for the prosecution; and in such case the action will not lie."

"Probable cause" as used in relation to an action for

malicious prosecution is such cause or grounds for the institution of a prosecution as is an absolute bar to an action for the institution thereof, even though it be clearly proven that the prosecutor was moved to·institute the prosecution by personal ill will toward the plaintiff. Various definitions of probable cause have been given,[4] but perhaps as satisfactory a definition as can be given is this:

 The probable cause which is an absolute bar to an action for malicious prosecution is knowledge by or information communicated to the prosecutor of such a state of facts and circumstances as would excite the belief in the mind of an ordinarily prudent man that the plaintiff is guilty of the crime with which he is charged, and has produced such belief in the mind of the prosecutor at the time he institutes the prosecution.[5] But it is to be observed, if the prosecutor relies upon information communicated to him, it must be such information as an ordinarily prudent man, under the facts and circumstances then known to the prosecutor, would be reasonably warranted in relying upon. *Scott* v. *Shelor*, 28 Gratt. (69 Va.) 891, 906; *Wheeler* v. *Nesbitt*, 24 How. (U. S.) 544, 16 L. Ed. 765; *Southern Ry. Co.* v. *Mosby*, 112 Va. 169, 70 S. E. 517; *Virginia Ry. & P. Co.* v. *Klaff*, 123 Va. 260, 266, 96 S. E. 244, 246; *Clinchfield Coal Corp.* v. *Redd*, 123 Va. 420, 440, 96 S. E. 836; *Gresham* v. *Am. Ry. Exp.*, 147 Va. 395, 399, 137 S. E. 471.

 It should be noted, however, that there may be cause or grounds for the institution of a prosecution, which, though it falls short of constituting probable cause, is sufficient to warrant an inference, unless the facts and circumstances

[4] For definitions of probable cause, see, in addition to cases cited in the text, *Spengler* v. *Davy*, 15 Gratt. (56 Va.) 381, 388; 38 C. J. p. 403, section 31, and cases there cited; 18 R. C. L. p. 35, section 20; 1 Cooley on Torts (3d Ed.) pp. 322-324; 1 Am. Lead. Cas. 213 (original paging); 26 Am. St. Rep., note at p. 138.

[5] That the cause which is an absolute bar to an action for malicious prosecution must have excited the belief in the mind of the prosecutor that the person charged by him with the crime was guilty thereof see *Munger* v. *Cox*, 146 Va. 574, 584, 131 S. E. 841, 132 S. E. 687; *Scott* v. *Shelor*, 28 Gratt. (69 Va.) 891, 906; *Forbes & Allers* v. *Hagman*, 75 Va. 168, 180; *Clinchfield Coal Corp.* v. *Redd*, 123 Va. 420, 438-440, 96 S. E. 836; *Boeger* v. *Langenberg*, 97 Mo. 390, 11 S. W. 223, 10 Am. St. Rep. 322; 26 Am. St. Rep., note at p. 140.

show the contrary to have been true, that the prosecution was in fact not instituted with malice. Perhaps the failure to bear this fact in mind is responsible for some of the variations in the definition of probable cause that have been given.

Malice as used in relation to an action for a malicious criminal prosecution is perhaps even more difficult to define with accuracy than probable cause;[6] and no definition thereof which has been formulated is sufficiently precise and comprehensive not to require that some description be added to make it clear and prevent a misapplication thereof.

In formulating and applying any definition thereof this cardinal principle must be borne in mind. The malice which is an essential element of an action for a malicious criminal prosecution is *actual* malice, or malice in fact, as distinguished from *imputed* malice, that is, malice imputed by law. It must exist in fact, and its existence must be proven as any other fact. It may be established by an inference drawn from the facts and circumstances proved, where they warrant such an inference, but it is never presumed or imputed by law. It is of the same *general* genus as the malice which must have existed to sustain an action of slander for words uttered upon a privileged occasion within the scope of the privilege;[7] and must be distinguished from the so-called malice which the law in certain classes of cases imputes to a wrongdoer from the *mere* intentional doing of a wrongful act to the injury of another without legal justification or excuse.[8]

[6] For definitions of malice as used in relation to an action for malicious prosecution, see 26 Am. St. Rep., note, p. 150; 18 R. C. L. p. 29; 38 C. J. pp. 422-424.

[7] As to what constitutes actual malice, or malice in fact, such as is necessary to sustain an action for slanderous words uttered upon a privileged occasion, and the distinction between it and *imputed* malice, see *Chesapeake Ferry Co.* v. *Hudgins*, 155 Va. 874, 899, 156 S. E. 429.

[8] There are a few cases involving actions for malicious prosecution in which the court has used language to the effect that malice exists wherever a wrongful act which is injurious to another is done intentionally without legal justification or excuse. 38 C. J. p. 424. But this is contrary to the overwhelming weight of authority; and it is

In actions of slander for words uttered upon an occasion not privileged and in actions for false arrest it is commonly said that the law *imputes* malice to the wrongdoer from the *mere* intentional doing of the wrongful act to the injury of another without legal justification or excuse. This is merely another way of stating the principle that the existence of malice, *i. e.,* a wrong motive or purpose, is not an essential element of these causes of actions. *Chesapeake Ferry Co.* v. *Hudgins,* 155 Va. 874, 899, 156 S. E. 429; 18 R. C. L. p. 2, section 1. But this is not true in actions for malicious criminal prosecution. For reasons of public policy the law makes the existence of a wrong motive or purpose in the institution of the prosecution an essential element of a cause of action for a malicious criminal prosecution; and its existence must be proven to sustain the action.

It must also be borne in mind that neither lack of probable cause nor the mere failure to act as a reasonably prudent man under the circumstances in instituting the prosecution is the same thing as malice.

Evidence tending to show lack of probable cause, or that the prosecutor failed to act as a reasonably prudent man, in instituting the prosecution, is always admissible for the purpose of proving malice; and often, when it is sufficient to prove lack of probable cause or failure to act as a reasonably prudent man, it is sufficient to warrant an inference (*i. e.,* prove) that the prosecutor was actuated by malice. But this is not necessarily true. There may be want of probable cause and a failure to act as a reasonably prudent man would have acted, and yet a lack of any malice whatever. *Womack* v. *Circle,* 32 Gratt. (73 Va.) 324, 332; *Southern R. Co.* v. *Mosby,* 112 Va. 169, 70 S. E. 517; 18 R. C. L. pp. 29-31, sections 16-17; 26 Am. St. Rep., note, pp. 149-151.

In some decisions the courts have used language to the effect that, as malice is used in relation to a malicious

doubtful whether the majority of the few courts which have enunciated this doctrine can be said to apply it in practice. So far as we are advised the Virginia court has never so defined malice as the term is used in relation to an action for malicious prosecution.

criminal prosecution, "any unlawful act which is done willfully and purposely to the injury of another is as against that person malicious," or that "willful doing of an unlawful act is malice sufficient to support the action." There is such language to be found in *Scott* v. *Shelor,* 28 Gratt. (69 Va.) 891, 909; *Evans* v. *Michaelson,* 146 Va. 64, 135 S. E. 683, 684; *Virginia Elec. & P. Co.* v. *Wynne,* 149 Va. 882, 894, 141 S. E. 829; and Burks' Pl. & Pr. (2d Ed.) p. 201. When willfully or willful is properly defined and understood, this definition though incomplete is not an incorrect statement. But unless the meaning of willfully or willful as here used is properly defined and explained, this statement is liable to be misunderstood and misapplied by a jury. For this reason this language is not to be commended for use in instructing a jury. See 38 C. J. p. 423, note 92, for cases from other jurisdictions in which this or similar language has been used.

In several Virginia cases involving malicious prosecution, in holding that the evidence was sufficient to warrant an inference that the prosecution was in fact instituted with malice and to sustain the verdict finding that it was so instituted, the court has said: "The improper motive or want of proper motive inferable from a wrongful act based upon *no* reasonable ground, constitutes of itself all the malice deemed essential in law to the maintenance of the action." (Italics ours.) *Spengler* v. *Davy,* 15 Gratt. (56 Va.) 381, 394; *Scott* v. *Shelor,* 28 Gratt. (69 Va.) 891, 909. It is true that where there is *no* reasonable ground for the institution of a prosecution, the jury may properly draw the inference that the prosecution was instituted with an improper motive (or what amounts to the same thing without any proper motive); and that malice *so proven* is sufficient to sustain an action for malicious prosecution. This is what we understand the court to have meant by this language. But if this language be understood, as there is danger of its being understood, to mean that in an action of malicious prosecution the law *imputes* malice from the mere institution of a prosecution without probable cause, it conveys a wrong im-

pression. It will be noted that Judge Burks with his usual fine discrimination avoids the quotation of this language in his discussion of malice as used in relation to actions for malicious prosecution, though he quotes the language from *Scott* v. *Shelor, supra,* which immediately precedes it.

In other cases the courts have more correctly defined malice as used in relation to actions for malicious prosecution as the intentional doing of a wrongful act towards another *with an evil or unlawful purpose. Cincinnati, etc., R. Co.* v. *Cecil,* 164 Ky. 377, 175 S. W. 654, 657; *Keiner* v. *Collins,* 161 Ky. 696, 171 S. W. 399, 402; *Schwartz* v. *Boswell,* 156 Ky. 103, 160 S. W. 748, 750; 38 C. J. 424, and cases cited in note 96. This definition gives consideration to the principles that the malice which is an essential element of an action for malicious prosecution is *actual* malice or malice in fact; that to constitute actual malice there must be *malus animus, i. e.,* a wrong motive or purpose; and that the existence of the wrong motive or purpose must be proved as a fact and will not be imputed by the law from the *mere* intentional doing of a wrongful act without legal justification or excuse. Its defect is that it does not define what constitutes an evil or unlawful purpose.

After a careful review of a large number of cases from other jurisdictions and an analysis of the Virginia cases bearing on the subject, we are of opinion that the most satisfactory definition of malice as used in relation to actions of malicious criminal prosecution, and that which is most consonant with the holdings of the Virginia cases on the subject is this: Malice as used in relation to a cause of action for a malicious criminal prosecution is any *controlling* motive other than a *bona fide* desire to further the ends of justice, enforce obedience to the criminal laws, suppress crime, or see that the guilty are punished, or the lack of a *bona fide* desire, *controlling* in its influence, to accomplish those purposes. *Leeker* v. *Ybanez,* 24 Ariz. 574, 211 Pac. 864, 865; 18 R. C. L. 30; 38 C. J. p. 423, section 65, and cases cited in note 93; 26 Am. St. Rep., note p. 151.

But "if this design is present, and its influence controlling,

the action of the prosecutor is not malicious, though influenced to some extent by other and forbidden considerations. 'If the selfish element is only incidental, it cannot be regarded as evidence of malice, for it can hardly be expected that all selfish aims and desires can be eliminated from such prosecution.' " 26 Am. St. Rep., note p. 151, citing *Thompson* v. *Beacon Valley Rubber Co.*, 56 Conn. 493, 16 Atl. 554; 18 R. C. L. p. 32; *Atkinson* v. *Birmingham*, 44 R. I. 123, 116 Atl. 205, 36 A. L. R. 366; *Linitzky* v. *Gorman* (City Ct. N. Y.) 146 N. Y. S. 313, 316.

It is not necessary to prove actual spite, hatred, ill will, or grudge against or desire to injure the person charged with the crime. Any *controlling* motive other than a *bona fide* desire to suppress crime and bring the guilty to punishment is such a wrongful motive for the institution of a criminal prosecution that it is malicious within the meaning of the term as here used; and a criminal prosecution instituted upon no or such slight grounds of suspicion as to indicate a general disregard of the rights of others directed by chance against the individual is malicious.[9]

The uncontradicted evidence shows that the facts and circumstances known to Herbert Freezer did not excite in his mind any positive and definite belief that Miller was guilty of having stolen any goods, and that on the contrary, he was confessedly in a doubtful state of mind as to whether he had or not. This being true, probable cause (*i. e.*, such cause as is an absolute bar to an action for malicious prosecution) was lacking; and the court did not err in holding that the evidence shows as a matter of law that probable cause did not exist, and in so instructing the jury.

But the court erred in holding and in instructing the jury that if it believed from the evidence "that the search warrant was sued out without such cause as would have prompted a reasonable man, acting in good faith and with due regard to the right of Miller to sue it out * * * the malice necessary to make the defendant liable to the plaintiff flows as a matter of law from the act itself." It seems to have

---

[9] *Darnell* v. *Shirley*, 31 Ga. App. 765, 122 S. E. 252.

been this mistaken view which led the court to set aside the verdict.

Though the evidence shows as a matter of law that probable cause was wanting, it shows facts and circumstances which might well have led Herbert Freezer to suspect Miller of being guilty; and it cannot, we think, be properly said that the evidence shows, as a matter of law, that he acted upon no or such slight grounds of suspicion as to indicate a wanton or reckless disregard of Miller's rights or a general disregard of the rights of others directed by chance against Miller. Nor do we think that it can be said from this evidence, as a matter of law, that the *controlling* motive by which Herbert Freezer was actuated in suing out the search warrant was not a *bona fide* desire to further the ends of justice, enforce the criminal laws, suppress crime and see the guilty punished. Whether or not this was the controlling influence which actuated him in his action, or whether he was motivated by some other controlling motive, *i. e.,* whether he was actuated by malice or not, was a question which under the evidence in this case was a question for the jury.

In 18 R. C. L. p. 30, section 17, the author says: "In an action for malicious prosecution the existence of malice in the original proceeding is always a question of fact exclusively for the jury. It must be found by them, or the action cannot be sustained. Hence it must always be submitted to them to find whether it existed. The court has no right to find it, nor to instruct the jury that they may return a verdict for the plaintiff without it. That the defendant was actuated by malice is an inference which may be drawn from proof of the want of probable cause, but such inference is one of fact to be drawn by the jury, and not a conclusion of law, nor is the inference one which the jury are required to make merely because they may find a want of probable cause. Even if there was no probable cause for the prosecution, but it is shown there was in fact no wrongful motive, the action for malicious prosecution cannot be maintained, and a verdict for the plaintiff will be set aside. That only actual

damages were assessed where the jury might have in addition given exemplary damages affords no reason for setting aside the verdict on the ground that such a finding shows no malice was present. If there was no malice in fact, no verdict at all should have been given. Malice is essential to the maintenance of any such action, and not merely to the recovery of exemplary damages."

We are not prepared to say that there may not be a case in which the evidence shows as a matter of law that a criminal prosecution was instituted with malice, but generally speaking, and in this case, the existence of malice in the institution of the prosecution is a question of fact for the jury.

Our conclusion is that the verdict of the jury was conclusive of the fact that the evidence did not show that the search warrant was sworn out with malice; and that the court erred in setting aside the verdict returned on the first trial.

The judgment of the court will be reversed, the verdict returned on the first trial reinstated, and judgment here entered thereon for the defendant.

*Reversed.*

CAMPBELL, C. J., and HOLT, HUDGINS and CHINN, JJ., *concurring:*

In actions for malicious prosecution, in order for the plaintiff to prevail he must show both malice and want of probable cause. Positive proof of malice is frequently difficult if not impossible. The motives which move the hearts of men are seldom susceptible of positive proof, and so of necessity we are sometimes compelled to resort to secondary evidence. Men are judged by the things they do, and out of these conditions has grown a rule which we have approved and adopted. It is thus stated in *Womack* v. *Circle,* 32 Gratt. (73 Va.) 324, 332:

"It is well settled that to maintain this action, both malice

and want of probable cause must be shown, and the onus is on the plaintiff to prove both.

"Malice *may* be implied from want of probable cause; but not necessarily. In the celebrated case of *Johnstone* v. *Sutton*, 1 Durn. & East. p. 544, Lord Mansfield and Lord Loughborough said, "From the want of probable cause malice may be, and most commonly is, implied. But that must be shown by the plaintiff."

This rule, so frequently stated, is, as we understand it, still the law in Virginia.

In concurring in the court's judgment, we would.make it clear that the weight of evidence which attaches to a want of probable cause is not to be diminished. A jury may still find that malice has been proven by want of probable cause, and give judgment accordingly.

See note by Judge Freeman to *Ross* v. *Hixon*, 46 Kan. 550, 26 Pac. 955, 26 Am. St. Rep. 123, 151; *Virginia Elec. & Power Co.* v. *Wynne*, 149 Va. 882, 141 S. E. 829.