Richmond

BILL EDWARDS OLDSMOBILE, INC., ET AL.

v.

WALTER G. CAREY

June 9, 1978

Record No. 770434

Present: All the Justices.

*David Craig Landin (McGuire, Woods & Battle,* on brief) for plaintiffs in error.

*Fred G. Wood, Jr.; Robert M. Huff (Chandler, Huff, Wood & Early, Ltd.,* on brief) for defendant in error.

COCHRAN, J., delivered the opinion of the Court.

Walter G. Carey, plaintiff in the court below, filed a malicious prosecution action against Bill Edwards Oldsmobile, Inc. (the Company), and William S. Edwards, Jr. (Edwards), defendants, for compensatory and punitive damages; the Company filed a counterclaim against Carey for $5,200.50, for the value of parts and services obtained by Carey for his personal use while employed by the Company. The account filed with the counterclaim showed certain credits in Carey's favor, including the sum of $247 for wages payable to Carey and applied on the account. Subsequently, with leave of court, Carey amended his motion for judgment to include a claim praying that the Company be ordered to return to Carey possession of a certain racing car wrongfully held by the Company and that judgment be awarded Carey against the Company in the amount of $247 for wages wrongfully withheld.

In a jury trial, motions to strike plaintiff's evidence, made when the taking of plaintiff's evidence had been concluded, and at the conclusion of the taking of all the evidence, were overruled, and the jury returned a verdict for Carey against both defendants jointly and severally, for compensatory damages for malicious prosecution, in the amount of $15,000, and a verdict for the

Company on its counterclaim against Carey in the amount of $4,000. The motion of defendants to set aside the verdict against them on the malicious prosecution claim was overruled. The motion of defendant Company to set aside the verdict on its counterclaim and enter judgment in its favor for $5,200.50, the amount sued for, was granted. Defendants have appealed the judgment order entered on the verdict in the malicious prosecution claim. As to the counterclaim, no appeal having been sought by Carey, the judgment of the trial court is final. No reference was made in the judgment order to Carey's claim of right of possession of the racing car.

Issues as to all the elements required to be established in order to prevail in a malicious prosecution action were submitted to the jury over defendants' objections. As Carey has obtained a jury verdict, approved by the trial court, we shall review the evidence in the light most favorable to him, in determining whether there was evidence to support the verdict.

On or about April 1, 1975, Carey took his 1974 Oldsmobile to the Company for repairs. At that time he had a conversation with William S. Edwards, Jr., the General Manager, that culminated in Carey's making application for the position of Parts Manager, for which he was qualified by training and experience. His application was approved, and his employment commenced on or about April 8, 1975. He was in charge of the parts room. His duties were to order and stock the parts room, to deliver parts to mechanics, and to sell parts across the counter to customers, writing tickets for the records. He was familiar with the operation of a parts room for General Motors Corporation vehicles, and he knew how to account for automotive parts received on invoices from wholesalers.

When parts were received from a wholesaler, Carey was to check them against the description on the wholesaler's invoice to see whether the parts matched the description. He would then check the invoice against the Company's purchase order and determine whether the wholesaler had sent the correct parts. Edwards testified that if everything was in order, Carey was to write "O.K." on the invoice. The next step was to indicate on the invoice the disposition of the parts. If a customer was waiting for a part, Carey would fill out a sales ticket indicating the customer's name and describing the part, and the sales ticket number would be written on the invoice. If a Company mechanic was waiting for a part in order to repair a customer's car, the mechanic would fill

out a repair order indicating the customer's name and describing the part, and the repair order number would be written on the invoice. If the parts were to go into inventory or to one of the various Company departments, or were to be credited to an internal expense account, Carey was to indicate the disposition by writing the correct account number on the invoice. Edwards testified that a sales ticket or repair order had to be filled out in order for a part to be charged to a customer's or an employee's account, and that this system was fully explained to Carey. Carey did not dispute this testimony.

Shortly after he was employed, Carey began to build a racing car on the Company premises after working hours, with the knowledge and consent of Edwards. Edwards understood that Carey would use the car to advertise the Company. Carey testified that he had an agreement with Edwards that he could order parts for the car through the Company and pay for them through weekly payroll deductions; that there was no limitation on the number of parts which he could obtain, and no requirement for prior approval; and that there was no agreement that he would keep his account current. Several of his paychecks showed $50 deductions from gross earnings of $150 per week. Carey said that on some occasions he told Edwards to keep the entire paycheck but there was no evidence that this was ever done. Carey said that he was not furnished monthly statements, but that he checked the status of his account from time to time in the office. The statement of his account dated April 30, 1975, showed three $50 credits and a balance due of $47.22. His May 31, 1975, statement showed one $50 credit, two other credits, and a balance due of $43.15.

An invoice dated April 14, 1975, shows that a Chevelle body and an engine were charged to the Company in the amount of $450. These were the initial parts for Carey's racing car, but there was no evidence that he filled out a sales ticket or repair order charging them to his account. Carey's explanation was that he delivered the invoice to Edwards the day the body and engine were received, and that he had been given express permission by Edwards to start work on the car. Other parts were ordered and put on the car during April, May, and early June. Carey testified that he wrote on all the invoices "charge these to Carey's account - Okayed by Carey - Charge to my account." He also testified that prior to getting parts, he always kept Edwards informed. Carey identified an invoice from General Motors Corporation dated April

28, 1975, for racing car parts charged to the Company in the amount of $301.33 which did not have any notation signed by him, but he testified that Edwards saw the parts when they arrived and knew what they were for. Other invoices for parts for the Chevelle were introduced into evidence which were not marked to be charged to Carey and for which there were no corresponding sales tickets or repair orders. Additional invoices were introduced which Carey had marked incorrectly to be charged to the parts room and to a "policy work" account of the Company. Title to the racing car was retained by Carey.

The car was completed, except for some welding, and Carey, using a Company truck, towed it to a local welding shop. According to Carey's testimony, Edwards came to him on a Wednesday afternoon in June with invoices that Carey had marked to charge to his account and complained that Carey had not put his account number on the invoices. Carey replied that he did not know that he had an account number. Edwards asked him if he knew approximately the balance of his account, and Carey said that he did not. Edwards, "very excited", returned later and informed Carey that his account was "in the neighborhood of $1500.00", and asked Carey if he could pay it at that time. Carey said that he could not. Still later in the afternoon, Edwards told Carey that the account was "far beyond" what he expected and "We can't go along with this any longer". Carey said that he did not have the money but would try to get it "from mainly" his parents, and that he tried unsuccessfully to reach his mother and brother by telephone. The next morning, when Edwards inquired again, Carey said that he had been unable to reach his mother, but that he would try again later. At about 11:00 a.m., Edwards approached him again, "not hostile, but . . . really angry", and again asked about the money. Carey said that he would try to find out about it. He left, went home to call his mother, but received a call from Farrish Oldsmobile in Fairfax offering him a job. This appealed to him because he "wasn't feeling too pretty about Mr. Edwards" and "figured it was time for a change." As the pay would be higher, he "figured" that he could pay Edwards off "through working for Farrish Oldsmobile".

Carey proceeded immediately to Fairfax, visited Farrish Oldsmobile, stayed overnight, remained all day Saturday, returned on Sunday to Charlottesville, but went to work in Fairfax at 8:00 a.m. Monday morning. As the Company was not open on Sunday, that was the reason he did not tell Edwards of his plans. He also

asserted that he had informed a Company employee, whom he did not name, that he was going to Farrish Oldsmobile. Carey later testified that he tried unsuccessfully to reach Edwards at home by telephone on Sunday.

Edwards testified that in early June an initial check of the Company records showed that more than $1,000 in parts for the racing car had been charged to the Company but had not been charged to Carey's account, as no sales tickets had been written. On June 17, 1975, he confronted Carey with these charges, and Carey told him that he would bring in the money the next day. The next day, when asked again for payment, Carey said that he would get the money. On the following morning, June 19, Edwards approached Carey and again asked for the money. Carey said that he had not been able to obtain any money, but that he had some in a bank account in Michigan, which he indicated was under his mother's control. Carey left that morning to make arrangements to get the money, saying that he would return within an hour or so. He never returned to the Company, nor did he inform Edwards or the Company of his whereabouts or whether he still intended to pay for the parts.

On June 20, the racing car was located at the residence of a friend of Carey's. After calling the Company attorney, Leigh Middleditch, for advice, Edwards had the car towed back to the Company premises. Edwards again called Middleditch, explained that there were many invoices not charged to Carey's account for parts for the racing car, and asked his advice. Acting on that advice, Carey called the police department. Detective Hughes came and discussed the matter with Edwards and his father, the President of the Company. Edwards testified that he went over with Hughes the entire Carey file, and that he had previously given the same information to Middleditch, who did not testify.

Hughes, testifying as a witness for Carey, said that he did not believe that each item was discussed in detail during his conference with Edwards and his father, but "the gist of it was that Carey had charged approximately $2,313.33 worth of equipment and apparently Edwards felt that he was out a great deal of money". According to Hughes's report Edwards wanted "full restitution in lieu of placing charges" against Carey. Hughes conceded that Edwards had made no charge against Carey and no recommendation to Hughes as to police action. Edwards had suggested that maybe Carey could be found and that he be given four days or so

before action be taken against him. Detective Hughes was not informed of any agreement whereby Carey could charge parts to the Company in unlimited amounts and pay for them by payroll deduction. The statements of account, however, which were furnished to Hughes, showed several credits of $50 each to Carey's account, which Edwards testified were payments for work done on Carey's personal car, a 1974 Oldsmobile. Hughes consulted the Commonwealth's Attorney, Richard Barrick, who reviewed the file and advised him to obtain a warrant against Carey on the detective's sworn statement. This was done on June 24.

On June 26, Farrish Oldsmobile called Edwards and indicated Carey's location. After consulting Middleditch, Edwards reported this information to the police, who had the Fairfax police arrest Carey and hold him until they arrived the same day and returned him to Charlottesville. On July 3, the return date of the warrant, Carey appeared with his attorney. Neither Edwards nor his father was summoned to appear. Although Detective Hughes testified that "it seem[ed]" to him that there was a plea bargain agreement made by the Assistant Commonwealth's Attorney Dezio and Carey's attorney under which the criminal charge would be *nol prossed* if Carey would make restitution, Carey testified that, to his knowledge, no such agreement was made. The Assistant Commonwealth's Attorney did not testify. A *nolle prosequi* order was entered.

Carey testified that he lost his job at Farrish Oldsmobile because of his arrest, that he was "supposed" to earn $1,200 a month there, or at least $400 a month more than at the Company, and that he had been unable to find work since. He was living in Detroit, Michigan, at the time of trial, and was 36 years of age. He had had four years of college education. He suffered from no disability, but complained of feeling that he was looked upon as a criminal and of being financially embarrassed as a result of his experience.

■ In several recent cases we have had occasion to restate the legal principles applicable in malicious prosecution actions. Such actions, which are not generally favored in Virginia, place upon the plaintiff the burden of proving (1) that the prosecution was instituted by, or with the cooperation of, the defendant; (2) that the prosecution terminated in a manner not unfavorable to the plaintiff; (3) that it was without probable cause; and (4) that it was malicious. *Bain v. Phillips*, 217 Va. 387, 393, 228 S.E.2d 576, 581 (1976); *Niese v. Klos*, 216 Va. 701 703, 222 S.E.2d 798, 800 (1976).

The Company and Edwards contend that the evidence was insufficient to create a jury issue as to any of the foregoing prerequisites to recovery, or as to damages, and that the trial court erred in not setting aside the verdict for Carey and entering judgment for defendants. They also argue that the trial court erred in instructing the jury. Accordingly, defendants ask that the judgment of the trial court be reversed and judgment be entered for them or, in the alternative, that they be granted a new trial.

We shall assume, without deciding, that Carey's evidence, though weak, was sufficient to create jury issues as to the malicious initiation of prosecution by defendants, termination of the prosecution in a manner not unfavorable to Carey, and damages. The crucial issue is whether Carey's evidence failed as a matter of law to establish lack of probable cause on the part of Edwards in calling the police and giving information which resulted in the issuance of the arrest warrant charging Carey with embezzlement.

Probable cause defeating a malicious prosecution action has been defined as "knowledge of such a state of facts and circumstances as excite the belief in a reasonable mind, acting on such facts and circumstances, that the plaintiff is guilty of the crime of which he is suspected". *Va. R. & P. Co.* v. *Klaff,* 123 Va. 260, 266, 96 S.E. 244, 246 (1918), quoted in *Bain* v. *Phillips, supra,* 217 Va. at 394, 228 S.E.2d at 581.

When the defendant has acted in good faith upon advice of reputable counsel, after a full disclosure of the facts, probable cause is established, even if the advice is incorrect. *Bain* v. *Phillips, supra,* 217 Va. at 394, 228 S.E.2d at 581. We cannot say, however, that the defense of advice of counsel was established in this case as a matter of law. Plaintiff's position is that he"was under the impression" that he and Edwards had an "understanding" whereby Carey bought parts for his racing car in the Company's name and on its credit, and agreed to pay the Company $50 per week or more through payroll deductions and that Edwards did not disclose the arrangement to Detective Hughes. From Hughes's testimony it is a reasonable inference that no such "understanding" was disclosed to him by Edwards. Middleditch did not testify, and it may therefore be presumed that his testimony, if given, would have been no more helpful to defendants than was Hughes's, since Edwards testified that he gave Middleditch and Hughes the same information. Advice of counsel would be

effective only within the limitations of the information communicated by the client, Edwards. The jury, having been instructed on the issue, accepted the evidence favorable to Carey and in effect found, by its verdict, that Edwards had failed to make a full disclosure of all material facts to Middleditch and to Hughes so that the advice of counsel was based upon incorrect or incomplete information.

■ Nevertheless, the failure of Edwards to make a full disclosure merely denied him the immunity sought in the affirmative defense of advice of counsel, which otherwise would have conclusively established probable cause. The "understanding" described by Carey and believed by the jury, was not sufficient in itself to show lack of probable cause on the part of Edwards.

Carey knew that he was obligated to pay for all parts used on the racing car. He had been employed by General Motors and he was familiar with the record-keeping duties required of him in supervising and managing a parts room for the Company. He knew that parts received by him must be checked against accompanying invoices and then either delivered to mechanics on repair orders, sold on cash purchase tickets, or placed in inventory, with appropriate notations. He knew that the parts for the racing car would be charged to his account only if he made the proper entries in the Company records, and he testified that this was done. The exhibits admitted into evidence show conclusively that in many instances this was not done. Invoices were not properly marked, purchase tickets were not drawn up, and in at least two instances, parts used on Carey's racing car were improperly charged to the Company or to a customer's account as designated by Carey's notations.

The test of probable cause is to be made as of the time when the action complained of was taken. *Bain* v. *Phillips, supra,* 217 Va. at 394, 228 S.E.2d at 581.

When Edwards called the police, he had found and produced records indicating that Carey had used parts of the value of $2,300 in his racing car, which Carey had not marked to be charged against his personal account. Edwards knew that several days before, he had approached Carey and confronted him with invoices aggregating at that time more than $1,000 for parts used on the car and not marked by Carey for his account, and that he and Carey had then properly marked those invoices and drawn up sales tickets. Edwards knew that he had demanded immediate

payment of the account, and that Carey had made no objection to the demand, had made no reference to the agreement which would have permitted him to pay in $50 weekly installments, and had promised to try to raise the money promptly. Edwards knew that at least twice thereafter he had insisted upon payment, and Carey had promised to renew his efforts to produce the necessary funds, had finally left during working hours, ostensibly to telephone his mother for financial assistance, and had disappeared without communicating with Edwards or the Company. Edwards also knew that, although the racing car had been removed recently to a welding shop, it had been located at the residence of a friend of Carey's.

With this knowledge, Edwards was advised to call and did call the police. He and his father went over the Carey file with Detective Hughes for forty-five minutes to an hour. They made it clear, and understandably so, that they were interested in getting their money. Indeed, acting on the advice of counsel, they had already moved in that direction by towing the racing car back to the Company premises. So they had the car with all the parts on it in their possession. Detective Hughes testified that neither Edwards nor his father charged Carey with any crime, although they felt that they were "out" a great deal of money. For that reason he consulted the Commonwealth's Attorney about the precise criminal charge to prefer. Edwards was not certain that Carey had committed any crime and, as Hughes testified, suggested that no action be taken for four days or so, in order to give Carey time to come back and explain his actions. No action was taken for four days, and then the warrant was issued. Carey had not returned, had not communicated with Edwards or the Company, and his whereabouts were unknown. Unlike the case presented in *Lee* v. *Southland Corp.*, 219 Va. 23, 244 S.E.2d 756 (1978) also decided this day, there is no conflict in the evidence as to these facts.

Under these facts and circumstances, we believe that it was reasonable for Edwards to infer that Carey had knowingly used in his racing car parts belonging to the Company which he did not intend to pay for. Edwards could reasonably infer that Carey had probably committed a crime, and we consider it immaterial that he did not identify the crime to the detective or directly charge Carey with the commission of any crime. It is not our purpose to discourage citizens, regardless of their motives, from reporting to

law enforcement authorities information which would cause a reasonable man to believe that a crime has been committed.

■ Carey's evidence, which we have assumed to be sufficient to show that Edwards acted maliciously, in that his controlling motive was not a bona fide desire to suppress crime and bring the guilty to punishment, *Freezer* v. *Miller,* 163 Va. 180, 207, 176 S.E. 159, 169-70 (1934), did not negate probable cause. Although malice may be inferred from lack of probable cause, lack of probable cause may not be inferred from malice. *Wiggs* v. *Farmer,* 205 Va. 149, 152, 135 S.E.2d 829, 831 (1964). Accordingly, we hold that Carey's evidence was insufficient as a matter of law to show that Edwards did not have probable cause to believe that a crime, described by the law enforcement officials as embezzlement, had been committed by Carey.

The judgment order of the trial court will be reversed and judgment will be entered here for appellants, defendants below, in the malicious prosecution action.

*Reversed and final judgment.*