W. Walker WARE, IV, Plaintiff,

v.

JAMES CITY COUNTY, VIRGINIA, Officer E. James, Officer Miller, Senior Officer Sten, and Sergeant McMichael, Defendants.

Civil Action No. 4:08cv8.

United States District Court,
E.D. Virginia,
Newport News Division.

Sept. 4, 2009.

Timothy M. Murphy, Kevin P. Shea, for Plaintiff.

Jeremy D. Capps, for Defendant.

## OPINION AND ORDER

MARK S. DAVIS, District Judge.

The plaintiff, W. Walker Ware, IV ("Ware" or "Plaintiff"), filed this civil rights action asserting claims under 42 U.S.C. § 1983 and Virginia law. This matter is before the Court on a Motion for Summary Judgment filed by defendants James City County ("County"), Officer E. James ("James"), Officer Miller ("Miller"), Senior Officer Sten ("Sten"), and Sergeant McMichael ("McMichael") (collectively, "Defendants"). The motion was fully briefed, and oral argument was held on August 4, 2009, the same morning that trial was scheduled to begin.[1] At the hearing, the Court indicated that it intended to deny Defendants' motion in part and grant it in part. Because James stated that he planned to file an interlocutory appeal of the Court's stated intention to deny his motion for summary judgment, trial of the matter did not take place. The Court instead indicated that it would issue an order reflecting the reasons for its ruling. Having now had the opportunity to more carefully examine the summary judgment briefs and the evidence submitted to the Court, the Court has revised its originally-stated intentions and determined that De-

fendants' motions should be granted in their entirety.

### I. Factual and Procedural History [2]

#### A. Sword incident

On the evening of January 31, 2009, Ware and Anthony Dail ("Dail") were involved in an incident at Dail's residence involving a sword. (Br. In Supp. Ex. 13, R. Cloyd Dep. 22:12–23:10, Docket No. 50.) While Ware had the sword in his hand and was discussing how he might defend himself with it, Dail suddenly flung his hand out and hit Ware. (*Id.*) A beer bottle that had been in Ware's hand somehow ended up hitting Ware's mouth, which upset Ware. (*Id.*) For reasons that are somewhat unclear, based on the events described above, Dail called the James City County Police Department around 6:00 p.m. to report that he had been assaulted by Ware with a sword. (*Id.* at 23:19–20; Ex. 1, Dispatch Summary, pg. 1.)

Officers Miller and Sten were dispatched to investigate Dail's complaint, and Dail stated that he had been assaulted by Ware. (*Id.* at Ex. 14, Miller Dep. 6:7–11; Ex. 11, Sten. Aff. 1.) Miller and Sten then went to Randy Cloyd's home, which is where Randy Cloyd and Ware were at the time, to investigate Dail's complaint. Randy Cloyd freely shared his version of the

---

1. Briefing was not concluded until July 22, 2009. The Court advised the parties that it was not sure there was time to rule on such motion before the August 4, 2009 trial, and that they should make trial preparations. However, mindful of the importance of addressing qualified immunity motions before trial begins, the Court ultimately decided to hear argument on such motions on the morning of trial in an effort to resolve as much of the case as could be resolved. The parties were advised on Friday, July 31, 2009 that they should be prepared for such oral argument to take place prior to trial on Tuesday, August 4, 2009.

2. The Complaint and Plaintiff's briefs are far from models of clarity. The Court is required

to view the facts in the light most favorable to Plaintiff, the nonmoving party. The Court's task has been made more difficult, however, because, for reasons unknown to the Court, other than an untimely submitted recording of a 911 telephone call, Plaintiff failed to attach any deposition testimony or other evidence to his brief in opposition to the motion for summary judgment, though at times Plaintiff references and quotes from depositions that were not provided to the Court. This leaves the Court in the unusual position of relying solely upon the evidence submitted by Defendants. Therefore, the facts reviewed by the Court below are taken from Defendants' submission of evidence to the Court and are viewed in the light most favorable to Plaintiff.

events with the officers, since he had been there at the time of the incident. Randy Cloyd stated that he did not believe that Dail ever came into contact with the sword. (*Id.* at Ex. 13, R. Cloyd Dep. at 23:19–20.) Ware, on the other hand, was uncooperative with the investigating officers and would not answer their questions. (Rebuttal Br., Ex. 1, Police Report, Docket No. 60.)[3] The police report indicates that Ware had a small cut on his lip, and that Dail had a minor scratch on his hand, for which he declined medical attention. (*Id.*) Miller's police report also reflects that "[a]ll parties were highly intoxicated" and that he "was unable to determine what had occurred."[4] (*Id.*) Miller having decided not to take further action, the parties were then "advised on the process to obtain warrants" for arrest from the Magistrate and the officers departed. (*Id.*)

## B. Dail's complaint of harassment

Several hours later, around 11:25 p.m., Dail again called the police to report that he was being harassed by Ware and Randy Cloyd and requested that the police "remind them of what was said earlier by officer on [the] earlier call."[5] (Br. In Supp. Ex. 3.) There is no evidence as to what specifically Dail wanted Ware and Randy Cloyd to be reminded of, nor is there any evidence as to which police officer Dail was referring. James was dispatched to respond to Dail's call since he had taken over the night shift. (*Id.* at Ex. 18, James Dep. 9:15–16.) James spoke by telephone to Dail, who advised that Ware and Randy Cloyd were harassing him. (*Id.* at 10:11–23.) Dail also advised James that Ware and Randy Cloyd might be located at a residence occupied by Daphne Tennille ("Tennille").[6] (*Id.* at 10:24–11:3.)

The Tennille residence was across the street from Dail's home.[7] (*Id.* at Ex. 15, Tennille Dep. 12:21–22.) After receiving a call from Ware earlier that evening, Tennille had invited Ware, Randy Cloyd, and Terry Cloyd to come over to her house. (*Id.* at Ex. 15, Tennille Dep. 26:9–13.) Tennille testified that Ware and the Cloyds arrived around 8:30 p.m. and brought a bottle of wine, and possibly some beer, with them when they came to her house. (*Id.* at 26:14–24; 27:21–24.)

**3.** There are a number of police reports, dispatch summaries, and other documents that were submitted to the Court as exhibits in support of Defendants' motion for summary judgment. The Court notes that "in ruling on a motion for summary judgment, the court should consider, in addition to the pleadings, all papers of record such as affidavits, answers to interrogatories, admissions and stipulations, documentary and other evidentiary materials, and facts subject to judicial notice, as well as any materials prepared in support of the motion." *Evans v. Sturgill,* 430 F.Supp. 1209, 1210 (W.D.Va.1977). Plaintiff has not objected to consideration of any of the evidence submitted by Defendants, and so the Court concludes that the evidence submitted by Defendants may be properly considered by the Court with respect to this motion for summary judgment.

**4.** Randy Cloyd testified at his deposition that Ware had one beer at Dail's house, and that

he himself had no more than one beer, if he had any at all. (*Id.* at Ex. 13, R. Cloyd Dep. at 22:1–11.)

**5.** Dail testified in his deposition that he discovered later that other people, not Ware, had been harassing him, thereby prompting his later call to 911. (Rebuttal Br. Ex. 14, Dail Dep. at 9:2–21.)

**6.** Daphne Tennille's married name is Daphne Talley. However, for ease of reference, the Court will refer to her as Tennille, which was her last name at the time the incident occurred.

**7.** Tennille was in sole possession of her residence. (*Id.* at 16:1–10.) Ware and Tennille had a "relationship" at one point, but it had ended in 2004. (*Id.* at 18:2–11.) Ware had not been an overnight guest at Tennille's house, to her knowledge, at any point after 2004. (*Id.* at 18:13–16.)

Although Tennille states that, during a telephone conversation around 7:00–7:30 p.m., Ware had requested permission "to stay at the house," (*Id.* at 24:1–10) the portions of Ware's deposition that were submitted to the Court do not clearly reflect Ware's intentions as to where he would stay the night, or how long he would stay (Ex. 16, Ware Dep. 71:5–25).

C. Interaction at Tennille's residence

The parties dispute the events that occurred when James arrived at the Tennille residence to investigate Dail's complaint, although the points most relevant to James' summary judgment argument have not been disputed by Plaintiff. James asserts that, when he arrived at the Tennille residence, he was investigating the Dail complaint of harassment and also a possible assault, although it is not completely clear as to when or how James learned of the previous incident involving the possible assault with the sword. (*Id.* at Ex. 18, James Dep. 8:21–25; 16:13–25.) When Tennille came to the door, James told her that he needed to talk to the two men in her house, and he wanted them outside.[8] (*Id.* at Ex. 15, Tennille Dep. 35:17–20.) James would not answer any of Tennille's other questions such as what men he wanted, what he wanted them for, or provide her with any other information. (*Id.* at 35:24–36:1.) According to Tennille, James then "barged into the house" or "pushed the door open and came into the house." [9] (*Id.* at 35:24–36:1; 47:18; 36:6–20.)

Ware was standing in the hallway with Tennille when she went to the door. (*Id.* at 31:19–32:1.) After entering the house, James told Ware that he wanted to talk to him, and his friend (presumably referring to Randy Cloyd), whereupon James alleges that Ware swore at him and refused. (*Id.* at Ex. 4, Police report, pg. 1.) James indicates that Ware then stepped into him in a lunging manner and pointed his finger in James' face. (*Id.*) James told Ware to take two steps back, which Ware refused to do and then Ware threatened James with bodily harm by saying "I'm not going to, I'll take you down!" (*Id.*) James advised Ware that he would be arrested for disorderly conduct and obstruction of justice if he continued his actions. (*Id.*) Ware nevertheless continued to refuse to speak to James, allegedly swore at him, and advised James to "go ahead and arrest me!" (*Id.*) James indicates that, at that point, he requested that another unit respond to the residence. (*Id.*)

Ware, Tennille, Randy Cloyd, and Terry Cloyd were all inside the Tennille residence when James came in. Ware testified that "[i]t was like an explosion into the house, and things started happening the second [James] broke through that door." (*Id.* at Ex. 16, Ware Dep. 100:6–9.) He testified that the occupants of the home were not even sure who James was looking for. (*Id.* at 116:3–17.) James could not see Randy Cloyd when he came in, and so

---

**8.** James had previously been to Tennille's home on several occasions. (*Id.* at 12:9–13.) The first time was in response to her call to the Police Department when she was concerned about interaction with Dail. (*Id.* at 19:2–7.) The other times James returned to the Tennille residence were apparently of his own initiative. (*Id.* at 8–19.) Tennille had previously asked James to keep an eye on her house, since she lived alone and she was afraid of Dail. (*Id.* at 19:17–19.) When James had previously visited, she would open the

door, and he would come in. (*Id.* at 22:1–4.) At some point, Tennille asked James not to return to her house without calling. (*Id.* at 22:9–11.) James complied with that request and did not return. (*Id.* at 22:11.)

**9.** In his police report, James indicates that he stepped into the house because he feared that the sword may be in the house, and he was aware of the earlier incident involving Dail. (*Id.* at 4, Police Report pg. 1.)

Tennille, among others, kept asking for the names of the persons that James wanted to see, presumably because James had only indicated that he wanted to see the two men in the house. (Ex. 15, Tennille Dep. at 36:22–37:25.)

At some point during the incident, Tennille asked James if he had a warrant to come into her house, to which James allegedly responded that "he didn't need a warrant to come in the house, that he could come in any time he wanted to." (*Id.* at 46:4–20.) Tennille also ordered James to leave at some point during the incident, although it is not clear as to precisely when that occurred. (*Id.* at 46:21–25.) On the other hand, Tennille indicates that she told James at least once while he was in the house, and at least once when she spoke to James after he backed out of the house, that James could speak to Ware inside the house. (*Id.* at 49:1–24.)

Both Ware and Tennille indicate that, later in the incident, Ware actually did agree to speak with James, but only either inside the house or behind the house, and not by himself. (*Id.* at Ex. 15, Tennille Dep. 42:3–7; Ex. 16, Ware Dep. 110:4–11.) James, however, refused and insisted on speaking to Ware "outside," presumably in the front of the house. (*Id.* at Ex. 15, Tennille Dep. 42:8–16.) James apparently never said the names of the two persons he wished to speak to, so the occupants of Tennille's home were allegedly unaware, at the time James stepped back out of the home, exactly who James wanted to speak to. (*Id.* at 48:6–25.)

Some of the more minor details are disputed as to what occurred between James and Ware. Ware testified that he did not yell or raise his voice with James during the incident. (*Id.* at Ex. 16, Ware Dep. 106:1–12.) On the other hand, Tennille's testimony is that Terry Cloyd was yelling, and that Ware raised his voice when James came toward Tennille. (*Id.* at Ex. 15, Tennille Dep. 47:1–6.) She further testified that Ware was telling James to get out of the house unless he had a warrant. (*Id.* at 47:8–10.) Tennille testified that Ware got in James' face, and that James was in a "real rough state of mind" during the incident. (*Id.* at Ex. 15, Tennille Dep. 37:15–16; 47:5–6.) She further testified that she did not recall Ware cursing, and that James was "real aggressive." (Rebuttal Br. Ex. 11, Tennille Dep. 51:1–10.) Ware testified that James had pointed his finger at Ware at some point during the incident. (*Id.* at Ex. 16, Ware Dep. 117:13–14.) However, it is important to note that there is no evidence before the Court that Ware denied pointing his finger at James, stepping into James in a lunging manner or threatening to take James down.

At some point during the incident, James threatened to arrest the occupants of the house if they did not stop yelling. (*Id.* at 117:15–16; Ex. 15, Tennille Dep. at 54:1–4.) Randy Cloyd asked what he could do to avoid arrest, to which James replied that Randy Cloyd could go outside to talk to him. (*Id.* at Ex. 16, Ware Dep. at 117:17–20.) Ware advised Randy Cloyd at one point to not go outside (because he would probably not come back in), or to go speak to James in the back of the house, rather than the front.[10] (*Id.* at 117:20–118:12.) Randy Cloyd went outside to talk to James, with his wife, Terry Cloyd, present as well.[11] (*Id.* at 118:13–19.) During

---

**10.** Ware's testimony is not altogether clear, but seems to indicate that he objected to speaking to James in the front yard because that would be considered being out in public, and Ware was presumably worried about the possibility of being charged with disorderly conduct (which must occur in a public location). (*Id.* at 118:1–13.)

**11.** The evidence does not reflect whether he went to the front or rear of the house.

that time, Ware and Tennille went upstairs to empty the contents of Ware's pockets because he thought he was going to be arrested. (*Id.* at 118:20–24.)

### D. Other officers arrive to support James

The evidence is not clear regarding when James decided to step outside the house. However, it is clear that at some point, James stepped outside of the house and called for backup. (*Id.* at Ex. 18, James Dep. 20:11–12.) Miller, Sten, and McMichael arrived at the house to support James. James discussed the situation with McMichael and told McMichael that there was probable cause to make an arrest. (*Id.* at 29:11–13.) All four officers then went into the house. (*Id.* at Ex. 14, Miller Dep. 12:12–19.) Ware was on the phone at the time the officers went in the house (presumably on one of the several phone calls he made to 911). (*Id.* at 14:8–9.) James then arrested Ware and put Ware in handcuffs, with Miller assisting by holding one of Ware's arms.[12] (*Id.* at 16:14–22.) Ware was then escorted out of the house.

### E. Plaintiff taken to Magistrate/jail

Following his arrest, James transported Ware to the Virginia Peninsula Regional Jail. Upon arrival at the sally port of the jail, James told Ware that if he gave James any problem, James would take him down on the concrete and drag him into jail. (Br. In Supp. Ex. 16, Ware Dep. 137:5–14.) James went around to Ware's side of the car, and opened the door. (*Id.* at 137:17–18.) At this point, the parties dispute what occurred. James claims that Ware put his head down and lunged at James once Ware stepped out of the vehicle. (*Id.* at Ex. 18, James Dep. 23:24–25.) Ware, on the other hand, testifies that he fell out of the car onto the concrete on his face, which he did deliberately so that James could not take him down since he was already down. (*Id.* at Ex. 16, Ware Dep. 138:19–25.) Ware states that he accomplished this by taking one step out of the car, went straight down on his knees and laid down on the concrete in front of the jail cameras. (*Id.* at 138:1–8.) James then called to the other correctional officers at the jail for assistance. (*Id.* at 138:20–25.)

James took Ware to the Magistrate's office where, pursuant to Va.Code § 19.2–82, he was examined and he requested that the Magistrate issue warrants for disorderly conduct, obstruction of justice, and assault and battery of a police officer. (*Id.* at Ex. 18, James Dep. 23:16–19.) James alleged the last charge based on Ware lunging at James at the Tennille residence, placing his finger on James, saying that he could take James down, and lunging toward James when stepping out of the vehicle. (*Id.* at 23:22–25.)

While in front of the Magistrate and beginning his testimony regarding probable cause, James asserts that Ware jumped up and again lunged at him, to the point that James had to use the minimal force necessary to protect himself. (*Id.* at 24:1–13.) Upon seeing Ware's actions, the Magistrate allegedly said that she saw enough to show assault and battery of a police officer, and that Ware could be removed from the office. (*Id.* at 24:13–20.) After hearing the rest of James' testimony, the Magistrate allegedly believed that James had sufficient evidence for probable cause on the charge of assault and battery of a police officer, without having to know the facts of Ware lunging at James at the house or in the sally port of the jail. The Magistrate allegedly did not believe that

---

12. James asserts that he arrested Ware for Disorderly Conduct and Obstruction of Justice. (*Id.* at Ex. 4. Police report, pg. 2.) James later realized that the Disorderly Conduct charge was inappropriate because the incident had not occurred in public. (*Id.*)

James had enough evidence for disorderly conduct or obstruction of justice based upon what James had presented. (*Id.* at 24:17–25.)

Ware himself testified that while in front of the Magistrate he stood straight up, turned to James and looked him "eyeball to eyeball" causing the other correctional officer in the office to put his hands on Ware, telling Ware to calm down and sit down. (*Id.* at Ex. 16, Ware Dep. 148:1–20.) In doing so, Ware asserts that he was perfectly sober, in control of his actions, and had no doubt as to what he was doing. (*Id.* at 148:8–11.) In his testimony, Ware started to address whether any touching was involved, but never stated whether or not he touched James or anyone else when he stood up in the Magistrate's office. (*Id.* at 148:2–9.) The Commonwealth's Attorney ultimately decided not to prosecute the assault and battery charge against the Plaintiff.

The Plaintiff filed his Complaint on January 31, 2008, asserting claims against the four individual defendant police officers ("individual defendants"), as well as James City County, their employer, and the Board of Supervisors. In his claims, he alleges violations by the individual defendants of his Fourth and Fourteenth Amendment rights to be free from unreasonable search and seizure pursuant to 42 U.S.C. Section 1983 (Count I), as well as liability under Section 1983 against James City County for an illegal custom or practice and failure to properly train its officers (Count VII). The Plaintiff also asserts state law claims of assault and battery against the "individual defendants," though he only specifically mentions James and Miller in the section delineated for that count (Count II); false arrest and illegal imprisonment against the "individual defendants" (Count III); common law and Section 1983 malicious prosecution against James (Counts IV

and V); and intentional infliction of emotional distress against James (Count VI).

A Motion to Dismiss was filed by Defendants in April 2008. The case was later re-assigned to this Judge, and oral argument of the motions to dismiss took place in September 2008. In its Opinion and Order dated November 25, 2008, the Court dismissed the claims against the Board of Supervisors, the claim for punitive damages against James City County, the official capacity claims against James, Miller, Sten, and McMichael, and the § 1983 malicious prosecution claim against James. The case was then scheduled for trial, various discovery disputes were addressed by a Magistrate Judge, and the summary judgment motion presently before the Court was eventually filed. Briefing on the motion concluded on July 22, 2009, less than two weeks before the scheduled trial.

## II. Discussion

### A. Standard of review

Summary judgment is appropriate only when a court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Seabulk Offshore, Ltd. v. Am. Home Assurance Co.,* 377 F.3d 408, 418 (4th Cir.2004). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the initial burden to show the absence of an essential element of the nonmoving party's case and to demonstrate that the moving party is entitled to judgment as a matter of law. *Honor v. Booz–Allen & Hamilton, Inc.,* 383 F.3d 180, 185 (4th

Cir.2004). "When a party has submitted sufficient evidence to support its request for summary judgment, the burden shifts to the nonmoving party to show that there are genuine issues of material fact." *Emmett v. Johnson,* 532 F.3d 291, 297 (4th Cir.2008).

To defeat summary judgment, the nonmoving party must go beyond the pleadings with affidavits, depositions, or other evidence showing genuine issues for trial. *See id.* at 324, 106 S.Ct. 2548. Conclusory statements, without specific evidentiary support, are insufficient to oppose a properly supported motion for summary judgment. *Causey v. Balog,* 162 F.3d 795, 802 (4th Cir.1998). In addition, a scintilla of evidence supporting the nonmoving party's position will not suffice. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. Rather, the evidence must be such that the fact-finder reasonably could find for the nonmoving party. *Id.*

### B. § 1983

#### 1. Fourth Amendment

Plaintiff's first claim is for unlawful search and seizure under 42 U.S.C. § 1983, which provides that "[e]very person, who under color of any statute . . . of any State . . . subjects . . . any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law." Specifically, Plaintiff alleges that the Defendants violated his rights under the Fourth Amendment by arresting him "without a warrant, without probable cause, and without exigent circumstances that would have prevented one of the officers from first obtaining a warrant." (Compl. ¶ 9, Docket No. 1.)

Plaintiff has made constitutional claims against each of the officers in their individual capacities. In moving for summary judgment with respect to this claim, the individual police officers argue that they are entitled to qualified immunity, which protects government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Defendants argue that they cannot be held liable under § 1983 because there was no constitutional violation of Plaintiff's rights since Plaintiff's warrantless arrest was supported by probable cause. Defendants further argue that, even assuming that the arrest was unconstitutional, they are entitled to qualified immunity because the rights which Defendants allegedly violated were not clearly established at the time of the arrest.

Qualified immunity provides "an *immunity from suit* rather than a mere defense to liability," *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), and therefore "should be resolved at the earliest possible stage of the litigation." *Anderson v. Creighton,* 483 U.S. 635, 646 n. 6, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The qualified immunity inquiry recognizes that reasonable mistakes may be made regarding the legal parameters of particular government conduct. *See Saucier v. Katz,* 533 U.S. 194, 205, 121 S.Ct. 2151, 533 U.S. 194 (2001). Thus, "all but the plainly incompetent or those who knowingly violate the law" are protected by qualified immunity. *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

The Supreme Court has outlined the two-pronged inquiry that governs the defendants' motions for summary judgment, namely 1) whether the facts, viewed in the light most favorable to the Plaintiff, make out a violation of a constitutional right; and 2) if so, whether the constitutional right in question was "clearly established"

at the time of the defendant's alleged violation. *Pearson v. Callahan,* — U.S. ——, 129 S.Ct. 808, 815–16, 172 L.Ed.2d 565 (2009). When a government official properly asserts the defense of qualified immunity, he or she is entitled to summary judgment if either there was no violation of a constitutional right or the right at issue was not clearly established at the time of the alleged misconduct. *Henry v. Purnell,* 501 F.3d 374, 377 (4th Cir.2007) (citing *Saucier,* 533 U.S. at 205, 121 S.Ct. 2151).

The determination regarding whether a right was "clearly established" must not be made as a general proposition, but rather made in light of the specific factual context of the case. *See Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. "[A] right may be deemed clearly established even if there is no prior decision addressing the precise conduct at issue, so long as its illegality would have been evident to a reasonable officer based on existing caselaw." *Rogers v. Pendleton,* 249 F.3d 279, 290 (4th Cir.2001). Therefore, the Court must assess whether the officer's conduct was reasonable under the circumstances known to that officer. *Pearson,* 129 S.Ct. at 815.

The qualified immunity determination should normally be made at the summary judgment stage in the litigation. *Schultz v. Braga,* 455 F.3d 470, 476 (4th Cir.2006). Qualified immunity does not, however, "override the ordinary rules applicable to summary judgment proceedings." *Id.* Whether the alleged violation "actually occurred . . . may or may not be . . . subject to determination as a matter of law" at the summary judgment stage. *Pritchett v. Alford,* 973 F.2d 307, 314 (4th Cir.1992). "If there are genuine issues of historical fact respecting the officer's conduct," the United States Court of Appeals for the Fourth Circuit has stated, "summary judgment is not appropriate, and the issue must be reserved for trial." *Id.*

In *Pearson,* the Supreme Court held that a district court may, in its discretion, skip the first prong of the test and move directly to consideration of the second prong—whether the constitutional right at issue is "clearly established." *Id.* at 816. However, in this case, it is appropriate to first address whether Plaintiff's arrest was unconstitutional before addressing whether the constitutional right was clearly established at the time of Plaintiff's arrest. The Court's task, therefore, is to determine for each alleged violation, first, whether, taking the facts in the light most favorable to Plaintiff, the individual police officers violated Plaintiff's Fourth Amendment rights, and if so, whether the Fourth Amendment right violated was "clearly established" at the time of the incident.

■■■ The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures." U.S. Const. amend. IV. It is well-settled under Supreme Court precedent that a warrantless arrest is reasonable under the Fourth Amendment, subject to limited exceptions not relevant here, "where there is probable cause to believe that a criminal offense has been or is being committed."[13] *Devenpeck v. Alford,* 543

---

**13.** The Supreme Court has said that, in determining whether a search or seizure is reasonable under the Fourth Amendment, courts first look to the statutes and common law of the founding era to determine the norms that the Amendment was meant to preserve. *Virginia v. Moore,* 553 U.S. 164, 128 S.Ct. 1598, 1602, 170 L.Ed.2d 559 (2008). When history has not provided a conclusive answer, courts consider "traditional standards of reasonableness 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.' " *Id.* at 1604 (internal citation omitted). This balancing of private and public interests is not in doubt

U.S. 146, 152, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004). Probable cause to make a warrantless arrest exists when the "facts and circumstances within the officer's knowledge ... are sufficient to warrant a prudent person ... in the circumstances shown, [to conclude] that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo,* 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979). Furthermore, it is also well-settled that "[w]hether probable cause exists in a particular situation ... always turns on two factors in combination: the suspect's conduct as known to the [arresting] officer[s], and the contours of the offense thought to be committed by that conduct." *Pritchett,* 973 F.2d at 314. Although probable cause demands "more than mere suspicion, ... evidence sufficient to convict is not required." *Taylor v. Waters,* 81 F.3d 429, 433 (4th Cir.1996). Therefore, "if a person is arrested when no reasonable officer could believe, in light of the contours of the offense at issue, that probable cause exists to arrest that person, a violation of a clearly established Fourth Amendment right ... ensues." *Rogers,* 249 F.3d at 290. The Court first addresses whether Miller, Sten, and McMichael are entitled to qualified immunity.

### a. Miller, Sten, and McMichael

■ Plaintiff has made the same Fourth Amendment claims against Miller, Sten, and McMichael under § 1983 as he has made against James. The claims against James are addressed in detail below. However, the Court first finds that Miller, Sten and McMichael are entitled to qualified immunity for their actions in supporting the arresting officer, James, because

their actions did not violate Ware's constitutional rights.

Miller, Sten and McMichael arrived on the scene and were told by James that probable cause existed to arrest Ware. Although these three officers were not present during James' investigation, they were not required to conduct an independent investigation of the facts to come to their own determination regarding whether probable cause existed. Such a requirement would be unworkable in the environments in which the police operate. It is enough that James told Miller, Sten and McMichael that he had probable cause to make an arrest, and that they had no information that would cause them to question James' statement. *See Wilson v. Kittoe,* 229 F.Supp.2d 520, 537–38 (W.D.Va.2002) (finding that a reasonable officer who arrives on the scene would defer to another officer's explanation of what transpired before his or her arrival).

Similar to *Kittoe,* where the evidence reflected that the officers spoke for only a moment or two before making the arrest, there is no evidence in this case that James had the opportunity to tell the other three officers about all of the events leading up to Plaintiff's arrest. *Id.* at 538. Contrary to Ware's assertion, it is irrelevant to the determination of probable cause based upon investigation of the alleged second incident that Miller and Sten had previously spoken to Ware in their investigation of the alleged first incident involving Dail. A number of hours had passed since Miller and Sten investigated the previously reported incident and, in the meantime, James and Ware were involved in some type of confrontation. At the time that Miller, Sten, and McMichael

"when an officer has probable cause to believe a person committed even a minor crime in his presence." *Id.* In such a case, "[t]he arrest is constitutionally reasonable." *Id.*

Therefore, for purposes of determining whether a seizure is reasonable, and constitutional, under the Fourth Amendment, this Court will focus on whether there was probable cause.

arrived on the scene, James told the other three officers that he had probable cause to arrest Ware. These three officers did not have the opportunity to assess the evidence, did not have the opportunity to determine whether probable cause existed, and did not make the decision to arrest Ware. Miller, Sten, and McMichael, as assisting officers, merely supported James, the lead officer, and provided for his safety during the arrest. Therefore, they did not affirmatively act in the alleged deprivation of Ware's rights and are not liable under § 1983.[14] *See Wright v. Collins*, 766 F.2d 841, 850 (4th Cir.1985) (holding that for an individual to be liable under § 1983, it "must be affirmatively shown" that the officer charged "acted personally in the deprivation of the plaintiff's rights"); *Randall v. Prince George's County, Maryland*, 302 F.3d 188, 204 (4th Cir.2002) (as a general matter, a law officer may incur § 1983 liability only through affirmative misconduct). Because Miller, Sten, and McMichael did not violate Ware's constitutional rights, they are entitled to qualified immunity under the first prong of the test.

Furthermore, even if it was found that Miller, Sten, and McMichael had affirmatively violated Ware's constitutional rights,

they would still be entitled to qualified immunity under the second prong of the test. It cannot be said that it was clearly established at the time of Ware's arrest that secondary officers on the scene of such an investigation violate an individual's constitutional rights by providing such backup support and safety for a lead officer who determines that there is probable cause to make an arrest and conveys such facially reasonable statement to the back-up officers.

For the above reasons, Miller, Sten, and McMichael's motions for summary judgment on this claim are **GRANTED** because they did not violate Plaintiff's constitutional rights.[15]

#### b. James

Having granted summary judgment for the three other police officers, the Court now addresses in detail the various Fourth Amendment claims that Plaintiff has made against James.

##### i. unreasonable search

■ Plaintiff has alleged that his Fourth Amendment right to be free of an unreasonable search of his person was violated by James. (Compl. ¶ 22(a).) This argument, which is actually phrased as an

---

**14.** Miller assisted James in holding Ware's arm while James placed Ware in handcuffs. (Br. In Supp. Ex. 14, Miller Dep. 16:14–22.) However, the Court concludes that there has been no showing that Miller affirmatively acted in the deprivation of Ware's rights because Miller relied upon James' determination that probable cause existed. The Court does not construe reliance upon another officer's probable cause determination as acting personally. However, to the extent that such actions could be construed as acting affirmatively, Miller meets the second prong of the qualified immunity test, and is therefore entitled to qualified immunity. Furthermore, the Court has found (below) that James did not violate Ware's constitutional rights and that, even if he had, he is entitled to qualified immunity under the second prong of the test. Therefore, it would defy logic to find that Miller is

not entitled to qualified immunity when the lead arresting officer, James, is entitled to qualified immunity.

**15.** During oral argument, it was suggested that Miller and Sten had some prior knowledge of relevant facts and that one of them may have made up his mind already that Ware should be arrested. Counsel suggested that Randy Cloyd was told that Ware needed to get a better attitude. However, that assertion, even if true, is irrelevant as there is no "evidence" before the Court that any such discussion occurred. Furthermore, a number of hours had passed since the initial incident, and James responded to a new 911 call. James, the lead officer, claimed to have probable cause to arrest, and the three supporting officers assisted him based on that representation.

"unreasonable search and seizure of his person," was presumably meant to only reference the allegedly unlawful entrance into the Tennille home, since Ware's brief addressed his expectation of privacy and the effect of Tennille's alleged consent to James' entry into the home. (Opposition Br. pg. 10.) Furthermore, none of the evidence before the Court reflects any search of Ware's person having taken place before his arrest at the Tennille residence. Plaintiff has an obligation to present his claims in a sufficiently clear manner such that the Court can address such claims. Because Plaintiff has failed to clearly articulate any unreasonable search claim, the Court will not speculate on whether he intended to assert more than an unreasonable seizure argument by his reference to an "unreasonable search and seizure of his person." Therefore, to the extent there is an unreasonable search claim, summary judgment is **GRANTED** as to such claim because Plaintiff has failed to adequately articulate the claim and provide supporting facts showing that there is a genuine issue of material fact. *Emmett*, 532 F.3d at 297.

ii. unreasonable seizure—arrest

■ As previously noted, a warrantless arrest is reasonable under the Fourth Amendment when probable cause exists. *Devenpeck*, 543 U.S. at 152, 125 S.Ct. 588. Therefore, the Court must determine whether James had probable cause to arrest Ware. James argues that he is entitled to qualified immunity because he had probable cause to arrest Ware for violating the Virginia obstruction of justice statute due to 1) Ware's interaction with James at the Tennille residence, and 2) Ware's purported direction to Randy Cloyd to not speak with James. James also argues that probable cause existed with respect to the incident in the Magistrate's office.

Ware argues that, as a threshold matter, even if James proves probable cause exist-

ed at the time of his arrest, the Court is precluded from considering such probable cause and granting qualified immunity since James unlawfully entered the Tennille residence. Ware claims that he had an expectation of privacy, and alludes to the possibility that he was an overnight guest, though he never clearly makes such an argument. (*See* Opposition Br. Pg. 10.) This is, in essence, an argument that James is precluded from relying upon any probable cause that may have developed after such alleged illegal entry into Tennille's residence because such probable cause would be "fruit of the poisonous tree."

This argument fails because "the fruit of the poisonous tree doctrine is not available to assist a § 1983 claimant." *Townes v. City of New York*, 176 F.3d 138, 148–49 (2d Cir.1999). As was recently stated in the case of *Nixon v. Applegate*, No. 2:06–2560–CMC–RSC, 2008 WL 471677 (D.S.C.2008):

"The evil of an unreasonable search or seizure is that it invades privacy, not that it uncovers crime, which is no evil at all." *Townes v. City of New York*, 176 F.3d 138, 148 (2d Cir.1999). Based on the deterrent rationale and the above and other persuasive precedent, the court will not exclude the evidence discovered in its analysis of the reasonableness of [the police officer's] arrest of Plaintiff. In other words, for this court to exclude the evidence of Plaintiff's criminal activity found by [the police officer] during the (albeit unreasonable) search would be to apply the exclusionary rule to this civil case. The Supreme Court has "never applied the exclusionary rule to civil cases, state or federal." *Wren* [*v. Towe* ], 130 F.3d [1154][,] 1158 [ (5th Cir.1997) ]. *See also Hector v. Watt*, 235 F.3d 154, 157 (3d Cir.2000) (agreeing with *Townes* ); *Townes*, 176 F.3d at 149 ("[T]he fruit of the poisonous tree doctrine is not available to assist a

§ 1983 claimant."); *Padilla v. Miller,* 14[3] F.Supp.2d 479, 492 (M.D.Pa.2001). *Id.* at *4. Furthermore, to the extent that there was any question about the legality of James' entry into the Tennille residence, "[Ware] has already reaped an enormous benefit by reason of the [alleged] illegal seizure [ ] to which he was subjected: his freedom, achieved by" the decision of the Commonwealth's Attorney not to pursue prosecution. *Townes,* 176 F.3d at 148. Therefore, whether James' original entry into the Tennille residence was lawful or not, it is irrelevant to the question of whether there was probable cause to arrest and any resulting qualified immunity. The Court begins with an analysis of whether probable cause existed to arrest Ware for obstruction of justice.[16]

### aa. obstruction of justice charge

James asserts that he had probable cause to arrest Ware for obstruction of justice, even though that was not the initial charge against Ware. James' initial reason for making the arrest need not be the criminal offense that ultimately is supported by probable cause from the known facts. *Devenpeck,* 543 U.S. at 153, 125 S.Ct. 588; *United States v. McNeill,* 484 F.3d 301, 311 (4th Cir.2007) (holding that even though an officer stated that he was arresting a subject for committing an "assault by threat," "the arrest is nonetheless valid if, based on the facts known to the officer, objective probable cause existed as to *any* crime."); *see Figg v. Schroeder,* 312 F.3d 625, 637 (4th Cir.2002) (concluding that plaintiff's constitutional rights were

not violated where there was probable cause to detain the plaintiff on some criminal charge, even though the detention was not originally based on that charge).

The Virginia obstruction of justice statute provides in relevant part as follows:

A. If any person without just cause knowingly obstructs ... any law-enforcement officer ... in the performance of his duties as such or fails or refuses without just cause to cease such obstruction when requested to do so by such ... law-enforcement officer, ... he shall be guilty of a Class 1 misdemeanor.

B. Except as provided in subsection C, any person who, by threats or force, knowingly attempts to intimidate or impede ... any law-enforcement officer, ... lawfully engaged in his duties as such, or to obstruct or impede the administration of justice in any court, is guilty of a Class 1 misdemeanor.

Va.Code § 18.2–460. James asserts that Ware's conduct at the Tennille residence provided probable cause for a violation of both of the above obstruction of justice subsections as Ware knowingly tried to obstruct James in the performance of his duties, and he attempted to intimidate and impede James while he was engaged in his duties.

The Fourth Circuit has noted that Subsection A contains two distinct prohibitions. Under what it terms the "Obstruction Clause," a person may not "without just cause knowingly obstruct[ ] ... any law-enforcement officer in the performance of his duties as such." *Wilson v.*

---

**16.** The Court notes that James has not argued, either in his briefs or at oral argument, that he had probable cause to arrest Ware as a result of any alleged assault which may have occurred at the Tennille residence arising from Ware's actions in allegedly lunging toward James and threatening him. Instead, James only argues that such alleged actions by Ware contributed to James finding that he

had probable cause to arrest Ware for obstruction of justice. Although Ware's actions may have constituted an assault, *see Clark v. Commonwealth,* 54 Va.App. 120, 676 S.E.2d 332 (2009), the Court will not consider such an argument because it was not made. Furthermore, no such argument having been made, there was no opportunity for response by Plaintiff.

*Kittoe,* 337 F.3d 392, 398 (4th Cir.2003). Under the "Refusal to Cease Clause," a person may not "fail[ ] or refuse [ ] without just cause to cease such obstruction when requested to do so by such ... law-enforcement officer." *Id.* The Court will analyze whether Ware's actions fall under Subsection A.

### 1. confrontation between James and Ware

Because this summary judgment motion became ripe shortly before trial, and the Court did not have the opportunity to review it as thoroughly as it would have liked, the Court had previously indicated at oral argument that it believed a genuine issue of material fact existed with respect to what occurred in the Tennille residence between Ware and James. For that reason, the Court denied qualified immunity to James following oral argument. However, having had further opportunity to examine in detail the evidence that was presented, the Court now concludes that there is no genuine issue of material fact with respect to this claim, and that summary judgment should be granted.

This Court follows the lead of the Fourth Circuit in deferring to the interpretation of the obstruction of justice statute rendered by the courts of Virginia. *Wilson,* 337 F.3d at 399 (citing *Bush v. Palm Beach County Canvassing Bd.,* 531 U.S. 70, 76, 121 S.Ct. 471, 148 L.Ed.2d 366 (2000) (per curiam) ("As a general rule, this Court defers to a state court's interpretation of a state statute.")). The Supreme Court of Virginia has held that:

"To constitute an obstruction of an officer in the performance of his duty, it is not necessary that there be an actual or technical assault upon the officer, but there must be acts clearly indicating an intention on the part of the accused to prevent the officer from performing his duty, as to 'obstruct' ordinarily implies opposition or resistance by direct action.... It means to obstruct the officer himself not merely to oppose or impede the process with which the officer is armed." ... [T]here is a broad distinction between avoidance and resistance or opposition.

*Jones v. Commonwealth,* 141 Va. 471, 478–79, 126 S.E. 74 (1925) (citation omitted).

In interpreting Subsection A of the obstruction of justice statute, the Virginia Court of Appeals, citing *Jones,* has held that "obstruction of justice does not occur when a person fails to cooperate fully with an officer or when the person's conduct merely renders the officer's task more difficult but does not impede or prevent the officer from performing that task." *Ruckman v. Commonwealth,* 28 Va.App. 428, 429–430, 505 S.E.2d 388 (1998). In that case, the court held that a motorist did not obstruct justice when he did not try to impede an investigation, but simply could not remember information that would have assisted the police in their investigation. *Id.* at 431, 505 S.E.2d 388. The Fourth Circuit has also recognized the distinction that the Virginia courts have made between conduct that merely impedes or frustrates the officer, which does not impose liability for obstruction of justice under the statute, as opposed to conduct that intentionally thwarts or prevents performance of his duties, which does. *See Rogers,* 249 F.3d at 291 (reviewing cases). In that case, Rogers was "stepping in front of [an officer who wanted to search the area around his home]" and "getting in his face." *Id.* at 291. The Fourth Circuit found that Rogers did not violate the obstruction statute because the officer testified that he merely stepped around Rogers without difficulty and then observed Rogers without interference while he was speaking with another officer. *Id.* The Virginia Court of Appeals recently noted that both *Ruckman* and *Rogers* indicate that "passive or unintentional behavior does not constitute obstruction." *Jones v.*

*Commonwealth,* No. 2515–05–1, 2007 WL 216322, at *2 (Va.App. Jan. 30, 2007 (unpublished)).

What occurred between Ware and James goes beyond "passive or unintentional behavior." The evidence indicates that Ware's behavior upon James' entrance into the house went well beyond merely making James' task more difficult or inconvenient. Instead, Ware actively attempted to obstruct James in carrying out his duty. The evidence before the Court, as contained in James' police report, indicates that James stepped into the house and advised Ware that he was investigating a call involving him and needed to speak to Ware in private. At that point, the police report indicates that Ware stated: "F* * * you I aint [sic] talken [sic] to you!" (Br. In Supp. Ex. 4, Police Report pg. 1, alteration added). Ware then "stepped into [James] in a lunging matter [sic] and pointed his finger in [James'] face." *(Id.)* When James advised Ware to immediately take two steps back, Ware replied "I'm not going to, I'll take you down!" *(Id.)* The only evidence contradicting this version of events as described by James is that Ware claims he did not swear at James. Otherwise, there is no evidence to contradict that Ware stepped into James in a lunging manner, pointed his finger in James' face, and threatened to take James down.[17]

Ware's undisputed actions as described above constitute probable cause to arrest under both the Obstruction Clause and the Refusal to Obey Clause in Subsection A of the obstruction statute. Ware first actively obstructed James by refusing to speak to James, stepping into him and pointing his finger in James' face. This was a direct attempt to obstruct James in the performance of his duty, which was to conduct an investigation of the 911 call. *See Burrell v. Virginia,* 395 F.3d 508 (4th Cir.2005) (officer had probable cause to issue a summons to motorist for obstruction of justice where he directly attempted to prevent an officer from carrying out his duty, which was to provide insurance information from an accident involving injury). Furthermore, Ware also refused to cease his obstruction when directed to do so by James. James ordered Ware to take two steps back, to which Ware not only refused, but also threatened Ware with bodily harm. Therefore, James had probable cause to arrest Ware for obstruction of justice under Subsection A of the statute.[18]

---

**17.** In a cursory reference in his Opposition Brief, Ware attempts to argue that, due to the allegedly unlawful entry into Tennille's residence, his subsequent obstruction constitutes an effort to resist an unlawful arrest. However, even if James' entry was unlawful, Ware had not been arrested at that time, so he could not have been resisting an unlawful arrest when he stepped into James in a lunging manner, pointed his finger in James' face, and threatened to take James down. Furthermore, even if exclusionary criminal principles applied to this § 1983 action, which they do not, *Townes,* 176 F.3d at 149, "the federal and state courts alike have uniformly rejected the argument that trial courts should suppress evidence relating to [the defendant's] violence or threatened violence toward police officers subsequent to an unlawful search or seizure or a warrantless entry." *Brown v. City of*

*Danville,* 44 Va.App. 586, 599, 606 S.E.2d 523 (2004) (internal quotations and citations omitted).

**18.** It is not necessary for the Court to address Subsection B of the obstruction statute given that the Court has already found that James had probable cause to arrest Ware for violating Subsection A. However, in the event that Ware's actions were not found to have constituted probable cause to arrest under Subsection A of the obstruction statute, the Court finds, in the alternative, that Ware's actions as described above also gave James probable cause to find that Ware had violated Subsection B of the obstruction statute. Ware used a "threat or force" to attempt to intimidate or impede James when he stepped into James in a lunging manner, pointed his finger in James' face, and verbally threatened him with

Because James had probable cause to arrest Ware for obstruction of justice, James did not violate Ware's constitutional rights.

However, even if it was determined that Ware's actions did not create probable cause to arrest and that a constitutional violation did occur, James is entitled to qualified immunity under the second prong of the qualified immunity test. Under the second prong of the qualified immunity analysis, the Court must determine whether the right alleged to have been violated was a clearly established right, such that a reasonable police officer would have known, under the same circumstances, that his behavior violated the right. "In determining whether a right was clearly established at the time of the claimed violation, courts in this circuit [ordinarily] need not look beyond the decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose." *Edwards v. City of Goldsboro,* 178 F.3d 231, 251 (4th Cir.1999) (internal citations and quotations omitted). Furthermore, in determining whether the right alleged to have been violated was clearly established, the right must be defined "at a high level of particularity." *Id.* at 250–51. Based on the case law above, the Court concludes that, even if there was a constitutional violation, it was not clearly established that a police officer may not arrest a person for obstruction of justice when that person obstructs the investigation by refusing to answer questions, stepping into the police officer in a lunging manner, points a finger at the police officer, refuses to step back, and threatens the police officer with bodily harm.

In summary, because James had probable cause to arrest Ware, no constitutional violation occurred as a result of such arrest. However, even if a constitutional violation was found to have occurred on such facts, the Court finds that it would not have been clear to James that he was violating a "clearly established" right. For these reasons, the Court **GRANTS** summary judgment on the unlawful arrest claim, finding that James is entitled to qualified immunity.

### 2. whether Ware told Randy Cloyd not to talk to James

James argues that there are undisputed facts indicating that Ware told Randy Cloyd not to talk to James. James argues that it is a clear violation of the obstruction of justice statute for Ware to attempt to prevent a witness from talking with James while James was attempting to conduct his investigation. However, the Court need not decide whether such alleged actions by Ware would violate the obstruction of justice statute, and therefore provide probable cause for Ware's arrest, because the Court has already found that James had probable cause to arrest Ware based on the events as described above.[19]

### bb. alleged sword assault on Dail

James also asserted that he had probable cause to arrest Ware based on the original incident between Ware and Dail involving the sword. The Court need not decide whether probable cause can be based upon reports of an incident which was already investigated by other law enforcement officers, and who decided not to

---

bodily harm. Therefore, James also had probable cause to arrest Ware under Subsection B of the obstruction statute.

**19.** The Court does note, however, that the evidence does *not* show that Ware attempted to prevent Randy Cloyd from talking to James. Instead, the allegedly undisputed tes-

timony by Ware which James relies upon is actually that Ware told Randy Cloyd not to *go outside* to talk to James. (Rebuttal Br. Ware Dep. 117:17–118:16.) James did not make the argument that Ware violated the obstruction of justice statute by merely advising Randy Cloyd not to speak to James in a particular location.

seek an arrest warrant, because the Court has already found that probable cause existed to arrest Ware based on obstruction of justice.

### cc. assault on a police officer

During oral argument, there was some lack of clarity as to whether Ware based his claims of constitutional violation on his initial arrest or the warrant that was issued by the Magistrate for his arrest. To the extent that any of Ware's claims are based upon the warrant that was issued by the Magistrate for assault on a police officer, James is entitled to qualified immunity for such claims. The evidence establishes that James had probable cause to charge Ware with assault on a police officer based on the events that occurred once Ware was transferred to jail.

 Virginia "has merged the common law crime and tort of assault so that today, a common law assault [punishable as a criminal offense] occurs when either set of elements is proved." *Carter v. Commonwealth*, 269 Va. 44, 46, 606 S.E.2d 839 (2005) (noting that this dual definition has been the law in Virginia since at least the Court's decision in *Burgess v. Commonwealth*, 136 Va. 697, 706–08, 118 S.E. 273 (1923)). Under the traditional criminal definition, an assault occurs "when an assailant engages in an overt act intended to inflict bodily harm and has the present ability to inflict such harm." *Carter*, 269 Va. at 47, 606 S.E.2d 839. Under the merged tort law definition, an assault occurs when an assailant "engages in an overt act intended to place the victim in fear or apprehension of bodily harm and creates such reasonable fear or apprehension in the victim." *Id.*

Ware testified that while he was in front of the Magistrate, he stood up, turned to James and "looked him eyeball to eyeball," at which point the correctional officer in the room put his hands on Ware and told Ware to calm down and sit down. (Br. In Supp. Ex. 16, Ware Dep. 148:2–16.) James testified in his deposition that, during this encounter in front of the Magistrate, Ware lunged at him to the point that, in order to get Ware off of him, he had to use the minimum force necessary to "protect" himself. (Br. In Supp. Ex. 18, James Dep. 24:8–14.) Based upon this evidence, an assault occurred because Ware, at the very least, engaged in an overt act intended to inflict bodily harm on James and had the present ability to do so. Furthermore, Ware's actions created enough apprehension of bodily harm that James felt he had to "protect" himself. Accordingly, there was no violation of Ware's constitutional rights arising from his arrest for assault on a police officer because probable cause existed for such arrest. Therefore, James' motion for summary judgment is **GRANTED** for the claim based upon a lack of probable cause for assault on a police officer.

### 2. Custom and policy/failure to train—Count VII

The Court previously interpreted Plaintiff's Count VII as an attempt to bring a § 1983 custom or practice claim as well as an inadequate training claim under § 1983. These claims were taken under advisement following oral argument; however, since the Court is now granting James' motion, the Court will rule on these claims based upon the briefs and evidence filed by the parties.

With respect to Plaintiff's custom or policy claim under § 1983, the County may only be liable if it "has undertaken an official policy or custom which causes an unconstitutional deprivation of the plaintiff's rights." *Brown v. Mitchell*, 308 F.Supp.2d 682, 692 (E.D.Va.2004) (citing *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Here, the Court has already found that no constitutional depri-

vation of Ware's rights occurred during his encounter with James, either at the Tennille residence or in the Magistrate's office. Therefore, if there is no constitutional deprivation of Ware's rights, it follows that the County could not have undertaken a policy that caused any such non-existent deprivation, and summary judgment is **GRANTED** on Ware's custom or policy claim against the County.

Similarly, with respect to Ware's failure to train claim, the Supreme Court of the United States has found that the County may only be liable for violations of § 1983 where "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact," and where Ware can prove that the deficiency in training actually caused the police officers' indifference to his constitutional rights. *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Again, in this case, the Court has found no constitutional deprivation of Ware's rights during the encounter between James and Ware at the Tennille residence or in the Magistrate's office. Therefore, summary judgment is also **GRANTED** on Ware's failure to train claim against the County because no deficiency in training by the County could have caused any violation of Ware's rights when no such constitutional deprivation existed.

## C. State law claims

In addition to Plaintiff's Fourth Amendment claim under § 1983, he has asserted supplemental state tort claims of assault and battery, false imprisonment, malicious prosecution, and intentional infliction of emotional distress against particular police officers.[20] Although Defendants' arguments with respect to the state law claims

lack significant clarity, the Court interprets such arguments as an assertion that Defendants are immune from suit under Virginia common law. The Court must therefore examine Virginia immunity law. *See Gray–Hopkins v. Prince George's County, Maryland*, 309 F.3d 224, 232 (4th Cir.2002) ("We must look to substantive state law, however, in determining the nature and scope of a claimed immunity.") (citing *Africa v. City of Philadelphia (In re City of Philadelphia Litig.)*, 49 F.3d 945, 957 (3d Cir.1995)).

The issue of sovereign immunity under Virginia law was thoroughly addressed in *Veney v. Ojeda*, 321 F.Supp.2d 733 (E.D.Va.2004). The court there stated:

> In Virginia, a government agent performing discretionary functions is protected from civil suit by sovereign immunity unless the agent's actions were grossly negligent. *See McLenagan*, 27 F.3d at 1009 n. 10 (citing *Colby v. Boyden*, 241 Va. 125, 128–29, 400 S.E.2d 184 (1991)). Gross negligence is defined as the "absence of slight diligence, or the want of even scant care." *Id.* at 1009 (quoting *Frazier v. City of Norfolk*, 234 Va. 388, 393, 362 S.E.2d 688 (1987)). Put differently, to prove gross negligence, a plaintiff must prove "an utter disregard of prudence amounting to complete neglect of the safety of another." *Id.*

*Id.* at 747. While the *Veney* court analyzed whether such actions were "grossly negligent," other courts appear to reverse the equation, asking whether the actions were "objectively reasonable" and, presumably, therefore not grossly negligent. *See Swann v. City of Richmond*, 498 F.Supp.2d 847, 874 (E.D.Va.2007) (holding

---

**20.** Because the Court has disposed of the federal claims, the Court must decide whether to exercise its discretion to address any remaining pendent state law claims. The Court

elects to address such claims because at this stage of the proceedings it promotes judicial efficiency. *See McLenagan v. Karnes*, 27 F.3d 1002, 1009 (4th Cir.1994).

that plaintiff's assault and battery claims were subject to summary judgment where the officers' actions were objectively reasonable). While using different terms, these courts appear to be describing the applicable test for sovereign immunity in Virginia. With that in mind, the Court next analyzes whether the individual police officers are immune under Virginia law from the particular claims, all of which are discretionary in nature. *See Colby v. Boyden,* 241 Va. 125, 128–29 (1991).

### 1. Assault and Battery—Count II

■ Ware has asserted claims of assault and battery against both James and Miller. The Virginia Supreme Court stated that "[t]he tort of assault consists of an act intended to cause either harmful or offensive contact with another person or apprehension of such contact, and that creates in that other person's mind a reasonable apprehension of an imminent battery." *Koffman v. Garnett,* 265 Va. 12, 16, 574 S.E.2d 258 (2003). It also defined the tort of battery, which is "an unwanted touching which is neither consented to, excused, nor justified." *Id.* A plaintiff's assault or battery claim can be defeated by a legal justification for the act, *see id.,* and Virginia law recognizes that police officers are legally justified in using reasonable force to execute their lawful duties. *See, e.g., Pike v. Eubank,* 197 Va. 692, 90 S.E.2d 821 (1956). Accordingly, if reasonable force is used by police officers in execution of their lawful duties, they are immune from suit for such acts.

#### a. Miller

■ The evidence establishes that Miller assisted James in making the arrest of Ware at Tennille's residence, and that his actions were not grossly negligent in providing back up support for James. As discussed above, he merely supported James, who made the decision to arrest based on his determination that probable

cause existed. Probable cause to arrest provided the legal justification for Miller's actions. Furthermore, Ware has not alleged that Miller used anything other than reasonable force when supporting James in arresting Ware, and the facts before the Court reflect only the use of reasonable force. Therefore, Miller is entitled to immunity, and his motion for summary judgment is **GRANTED** with respect to Ware's assault and battery claims.

#### b. James

■ Although Plaintiff has asserted assault and battery claims against James, it is not clear, either from the Complaint or the briefs, precisely what incident Ware relies upon in making these claims. However, regardless of whether Ware's claims are based on the events which occurred at Tennille's house at the time of arrest, or whether his claims are based on the events which occurred in front of the Magistrate, or elsewhere, there is no evidence that anything other than reasonable force was used by James in executing his lawful duties. Therefore, James is entitled to immunity, and his motion for summary judgment is **GRANTED** with respect to Ware's assault and battery claim.

### 2. False Imprisonment—Count III

Plaintiff has asserted a false imprisonment claim against each of the individual officers. To prevail, Plaintiff must prove that he was detained; then it is for the Defendants to proffer an adequate legal justification warranting that detention. *Figg v. Schroeder,* 312 F.3d 625, 642 (4th Cir.2002) (citing *W.T. Grant Co. v. Owens,* 149 Va. 906, 921 (1928)). The *Veney* court summarized the applicable immunity law, stating as follows:

In *DeChene v. Smallwood,* 226 Va. 475, 479, 311 S.E.2d 749 (1984), the Supreme Court of Virginia made clear that a law

enforcement officer may not be held liable for a false arrest if the officer acted " 'in good faith and with probable cause.' " *Id.* (quoting *Pierson v. Ray,* 386 U.S. 547, 555, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967)). To establish the defense, an officer " 'need not allege and prove probable cause in the constitutional sense.' " *Id.* (citing *Bivens v. Six Unknown Named Agents of Fed. Bur. of Narc.,* 456 F.2d 1339, 1347 (2d Cir. 1972)). Instead, the officer must allege and prove (i) that he believed in good faith that the arrest was lawful and (ii) that his belief was reasonable. *Id.* *Veney,* 321 F.Supp.2d at 747.

### a. Miller, Sten, and McMichael

■ Miller, Sten, and McMichael are entitled to summary judgment on this claim. The evidence establishes that they arrived on the scene after James and merely provided back up support for James, who was the lead arresting officer responsible for detaining Ware. The evidence before the Court reflects that these officers, having been informed by James that probable cause existed for Ware's arrest, had a good faith belief that the arrest was lawful, and that belief was reasonable. Therefore, because they acted in good faith and with probable cause, they were not grossly negligent, and their motion for summary judgment is **GRANTED** with respect to Plaintiff's false imprisonment claim.

### b. James

As with Ware's assault and battery claims against James, it is unclear as to what events provide the basis for Ware's false imprisonment claim against James. James argues that he is entitled to summary judgment because Ware's arrest was

legally justified by probable cause. As addressed earlier, James had constitutional probable cause to arrest based on the events which occurred at the Tennille residence, as well as the events which occurred in the Magistrate's office. He also acted in good faith and with probable cause pursuant to the Virginia immunity standard discussed above. There is no genuine issue of fact as to whether he believed in good faith that the arrest was lawful or that his belief was reasonable. Therefore, James' actions were not grossly negligent, and his motion for summary judgment is **GRANTED**.

### 3. Malicious prosecution—count IV

Plaintiff has asserted a malicious prosecution claim against James alone. This matter was not addressed during oral argument; however, the Court will rule on this claim based upon the briefs and evidence filed by the parties.[21]

■ In order to establish a malicious prosecution claim, Ware must prove "1) that the prosecution was instituted by, or with the cooperation of, the defendant; 2) that the prosecution was terminated in a manner not unfavorable to [him]; 3) that it was without probable cause; and 4) that it was malicious." *Reilly v. Shepherd,* 273 Va. 728, 732, 643 S.E.2d 216 (2007). Actions for malicious prosecution "are not favored in Virginia" and the "requirements for maintaining such an action are more stringent than other tort cases." *Id.* at 733, 643 S.E.2d 216.

It is not clear to the Court whether Plaintiff's malicious prosecution claim is based upon James' actions with respect to Plaintiff's original arrest at the Tennille residence or rather the incident which occurred in the Magistrate's office. Howev-

---

**21.** The Court need not analyze the Virginia law of immunity because it concludes that this claim fails based on the evidence, even

when viewed in the light most favorable to Plaintiff. *See Figg,* 312 F.3d at 637–38.

er, with respect to either basis, James' motion for summary judgment is **GRANTED** because Plaintiff cannot prove the necessary elements required for this claim. Specifically, Ware's evidence fails to satisfy the third element of this claim—a lack of probable cause. As addressed above with respect to Ware's § 1983 claim against James, probable cause existed based upon both the interaction between Ware and James at the Tennille residence and the incident which occurred in the Magistrate's office. A finding of probable cause bars an action for malicious prosecution. *Freezer v. Miller*, 163 Va. 180, 202, 176 S.E. 159 (1934).

Furthermore, Plaintiff also cannot meet the fourth element of the test—malice. Ware's evidence fails to establish malice, which thereby entitles James to summary judgment. The Supreme Court of Virginia has found that "malice is defined as any *controlling* motive other than a good faith desire to further the ends of justice, enforce obedience to the criminal law, suppress crime, or see that the guilty are punished." *Hudson v. Lanier*, 255 Va. 330, 333, 497 S.E.2d 471 (1998) (citing *Freezer*, 163 Va. at 206, 176 S.E. 159). James and Ware had not even met or had any adverse interactions prior to January 31, 2006, and Ware has presented no evidence showing malice. (Br. In Supp., Ex. 16, Ware Dep. 43:4–6, 47:13–18, June 12, 2009; Ex. 18, James Dep. 4:13–16, June 15, 2009.) Therefore, Plaintiff has failed to establish that James acted with a controlling motive other than a good faith desire to further the ends of justice and enforce obedience to the criminal laws.

For all of the above reasons, James' motion for summary judgment is **GRANTED** with respect to Plaintiff's malicious prosecution claim.

#### 4. Intentional infliction of emotional distress—count VI

Ware asserts a claim of intentional infliction of emotional distress against James only.[22] Actions for intentional infliction of emotional distress are not favored in Virginia. *Harris v. Kreutzer*, 271 Va. 188, 204, 624 S.E.2d 24 (2006). The Supreme Court of Virginia has established that a plaintiff cannot recover on a claim of intentional infliction of emotional distress unless he can show by clear and convincing evidence that "1) the wrongdoer's conduct was intentional or reckless; 2) the conduct was outrageous or intolerable; 3) there was a causal connection between the wrongdoer's conduct and the resulting emotional distress; and 4) the resulting emotional distress was severe." *Supervalu, Inc. v. Johnson*, 276 Va. 356, 370, 666 S.E.2d 335 (2008); *see also Almy v. Grisham*, 273 Va. 68, 77, 639 S.E.2d 182 (2007); *Womack v. Eldridge*, 215 Va. 338, 342, 210 S.E.2d 145 (1974).

 Assuming, without deciding, that a reasonable jury could find that Plaintiff had satisfied the first three elements, Plaintiff's claim for intentional infliction of emotional distress must fail because Plaintiff cannot show by clear and convincing evidence that he has suffered the emotional distress required to meet the fourth element. With respect to the fourth element, "liability arises only when the emotional distress is extreme, and only where the distress inflicted is so severe that no reasonable person could be expected to endure it." *Russo v. White*, 241 Va. 23, 27, 400 S.E.2d 160 (1991) (citing Restatement (Second) of Torts § 46 cmt. j).

The pertinent facts as to Plaintiff's emotional distress, while significant to him, are

---

22. As with Plaintiff's malicious prosecution claim, the Court need not analyze the Virginia law of immunity because it concludes that this claim fails based on the evidence, even when viewed in the light most favorable to Plaintiff. *See Figg*, 312 F.3d at 637–38.

unremarkable in the emotional distress legal claim context. Ware stated in his deposition that he saw a medical professional at one point, but was not sure whether such medical professional was a medical doctor or a psychiatrist or psychologist. (Ware. Dep. Pg. 35) This medical professional prescribed some type of medication to Ware, but Ware did not know what it was. (*Id.* at 36) He took it for about two days and then stopped. (*Id.*) He has not alleged any other consultations with any medical professionals. Plaintiff's other allegations are simply that he has "emotional issues" (*id.*). However, Plaintiff could not even state whether he consulted with the medical professional as a result of stress over this litigation or other litigation related to a wetlands dispute between Plaintiff and the County. (*Id.* at 37–38).

In contrast to Ware's very general claims, the Supreme Court of Virginia has found that even very specific allegations of "severe psychological trauma and mental anguish affecting [the plaintiff's] mental and physical well-being," with symptoms including "nightmares, difficulty sleeping, extreme loss of self-esteem and depression, requiring additional psychological treatment and counseling" were insufficient to support the severity element for this type of claim. *Harris*, 271 Va. at 204–05, 624 S.E.2d 24. In *Russo*, the plaintiff "alleged that she was nervous, could not sleep, experienced stress and its physical symptoms, withdrew from activities, and was unable to concentrate at work," which was also "not the type of extreme emotional distress" that gives rise to liability. *Russo*, 241 Va. at 28, 400 S.E.2d 160. In *Almy*, however, the Supreme Court of Virginia found that a plaintiff adequately alleged severe emotional distress where she asserted that defendants' conduct had "caused her to suffer from several debilitating conditions, including depression, nervousness, and an inability to sleep, which ultimately caused a complete disin-

tegration of virtually every aspect of her life." *Almy*, 273 Va. at 79, 639 S.E.2d 182. By way of distinguishing cases such as *Russo* and *Harris*, the *Almy* court noted that "[w]hile both Almy and the plaintiff in *Harris* alleged that they required counseling and suffered from severe psychological trauma, depression, humiliation and injury to reputation, Almy additionally alleged that the defendants' actions rendered her functionally incapable of carrying out any of her work or family responsibilities." *Id.* at 80, 639 S.E.2d 182 (citation omitted).

■ The application of Virginia law compels the conclusion that the Plaintiff cannot establish by clear and convincing evidence that he has suffered the severe emotional distress required to successfully make this claim. Although Plaintiff may have "emotional issues" as a result of this experience, any emotional distress suffered by Plaintiff is more similar to the mental anguish suffered by the plaintiffs in *Harris* and *Russo*, rather than the debilitating distress suffered by the plaintiff in *Almy*. Plaintiff has had only one visit with a medical professional about whom he cannot provide any further details. Plaintiff took the medication prescribed for him by said medical professional for only two days, and otherwise can only allege "emotional issues." Such facts would not allow a reasonable jury to find by clear and convincing evidence that Ware experienced emotional distress "so severe that no reasonable person could be expected to endure it," which is a required element of his intentional infliction of emotional distress claim. *Russo*, 241 Va. at 27, 400 S.E.2d 160. Therefore, James' motion for summary judgment is **GRANTED** as to Plaintiff's claim for intentional infliction of emotional distress.

### III. Conclusion

For the reasons set forth above, Defendants' motion for summary judgment is

GRANTED with respect to the § 1983 claims against Miller, Sten, McMichael, and James. The County's motion for summary judgment is GRANTED with respect to Ware's custom or policy and failure to train claims brought under § 1983. Defendants' motion for summary judgment is GRANTED with respect to the state law claims of assault, battery, false imprisonment, malicious prosecution, and intentional infliction of emotional distress against Miller, Sten, McMichael, and James.

IT IS SO ORDERED.